# DEFENDANTS'
# EXHIBIT B

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



JOY LASKAR, Ph.D.,

    Petitioner,

v.

THE BOARD OF REGENTS OF
THE UNIVERSITY SYSTEM OF
GEORGIA,

    Respondent,

and

G.P. "BUD" PETERSON, in his
official capacity as President of the
GEORGIA INSTITUTE OF
TECHNOLOGY, a Unit of the
University System of Georgia,
governed by the BOARD OF
REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA,

    Defendant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

Civil Action No. 2011CV205556

**FILED IN OFFICE**

OCT 1 3 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## MOTION TO DISMISS
## PETITION FOR WRIT OF CERTIORARI  OR IN THE
## ALTERNATIVE PETITION FOR WRIT OF MANDAMUS

COME NOW the Board of Regents for the University System of

Georgia  ("Board of Regents") and Dr. G.P. "Bud" Peterson ("Dr.

Peterson"), in his official capacity as President of the Georgia Institute of

Technology ("Georgia Tech"), Respondents in the above-styled action, by



DEFENDANT'S
EXHIBIT

B

and through their counsel of record, the Attorney General for the State of Georgia, and, pursuant to O.C.G.A. §§ 9-11-12(b)(1) and 9-11-12(b)(6), file this Motion to Dismiss on the grounds that this Court lacks subject matter jurisdiction and Petitioner has failed to state a claim upon which relief can be granted.

The decision of a public university to terminate an employee is not subject to judicial review unless the employee can establish that he was denied due process during the course of the termination proceedings. *Bd. of Regents v. Houston*, 282 Ga. App. 412, 414 (2006). *See also Bd. of Regents v. Edmunds*, 302 Ga. App. 1, 10-12 (2009) ("the Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill advised personnel decisions."). While Petitioner may disagree with the Board of Regents' decision, Respondents provided Petitioner with all due process to which he was entitled prior to that decision being made and Petitioner's procedural due process claims fail as a matter of law. Petitioner has failed to allege any other legal basis upon which he is entitled to any relief against Respondents.

WHEREFORE, for the above and foregoing reasons, Respondents respectfully submit that this Court should dismiss the Petition for Writ of Certiorari or in the Alternative Petition for Writ of Mandamus in its entirety

and cast all costs against Petitioner.  A Brief in support of this motion is submitted herewith.

Respectfully submitted,

SAMUEL S. OLENS          551540
Attorney General

DENNIS R. DUNN          234098
Deputy Attorney General

STEFAN RITTER          606950
Senior Assistant Attorney General

JULIA B. ANDERSON          017560
Senior Assistant Attorney General

**Please serve:**

JULIA B. ANDERSON
Senior Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia  30334-1300
(404) 463-3630 (telephone)
(404) 657-9932 (facsimile)

# DEFENDANTS'
# EXHIBIT B-1



**Georgia Institute
of Technology**

Office of the President

### BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
### FISCAL YEAR EMPLOYMENT CONTRACT - TENURED FACULTY

To:   Joy Laskar                        Electrical & Computer Engineering 0250

Please be advised that the Board of Regents of the University System of Georgia has approved your employment as Professor at the Georgia Institute of Technology. The period of your employment is from July 1st, 2009 to June 30th, 2010.

Your salary will be $207,744 and is payable according to the applicable funding sources and the Institution's payroll schedule. For fractional portions of a pay period in which service is rendered, payment of salary will be computed as the fraction of the salary for that payroll period.  Notwithstanding any other provision of this contract, for Fiscal Year 2009-2010, the Board of Regents has authorized the president to implement a mandatory furlough program requiring employees to take not more than 10 days of unpaid leave. In the event it becomes necessary for the president to exercise this authority, employee furloughs will be implemented in accordance with guidelines promulgated by the Office of the Chancellor.

Your specific job-related duties, responsibilities, and assignments associated with this employment contract are defined elsewhere, are subject to modification as needed, and are determined by the administrative officers of the institution in your reporting line to the president.

This agreement is made expressly subject to the applicable state and federal laws and to the statutes and regulations of this institution and to the Bylaws and Policies of the Board of Regents, which are available for your inspection upon request.

Please signify your acceptance of this employment by signing and returning the enclosed original contract and all but one of the copies to your unit head within twenty (20) days from this date. Failure to reply within this deadline may void this offer.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
BY AND ON BEHALF OF THE GEORGIA INSTITUTE OF TECHNOLOGY

By : _____        Date: _August 12, 2009_
              President

### CONTRACT ACCEPTANCE

I accept the employment described above under the terms set forth.

Signed: _____        Date: _9/3/09_

Georgia Institute of Technology
Atlanta, Georgia 30332-0325 U.S.A.
PHONE 404-894-5051
FAX 404-894-1277

*A Unit of the University System of Georgia        An Equal Education and Employment Opportunity Institution*





# DEFENDANTS' EXHIBIT B-2

Case 1:13-cv-01609-TWT    Document 7-3    Filed 07/29/13    Page 8 of 63

4. Assuming professional student counseling center responsibilities, providing specialized skill acquisition training as support for academic programs; and,
5. Working with tenure-track faculty members in course and curriculum development and in the laboratory.

(BoR Minutes, October 2008)

General categories for Academic Professionals would include:

1. *Training and Instructional Support.* This includes educational needs assessment, program development and coordination, instructional materials and technology development, delivery of specialized or skill acquisition instruction, and program evaluation. In light of the restriction above, Academic Professionals must be persons whose instructional duties account for less than half of their total time.
2. *Technical Assistance.* An advisory or operating role which provides specialized knowledge appropriate for program support and development. The activities range from a significant or advisory or operating role to managing a technical support unit to development of organizational structures and function.
3. *Specialized Management.* This includes supervision of clinical practice or field experience, or providing services or out-of-class educational opportunities for students.

Career ladders may be established for Academic Professionals, using the following titles: Academic Professional Associate, Academic Professional, and Senior Academic Professional (BoR Minutes, February 2007).

All provisions of Section 8.3.8 of the Board of Regents' Policy Manual will apply to the employment of Academic Professionals.

return to top

## 8.3.9 Discipline and Removal of Faculty Members

The president of an institution may at any time remove any faculty member or other employee of an institution for cause. Cause shall include willful or intentional violation of the policies of the Board of Regents or the approved statutes of an institution. Further causes or grounds for dismissal are set forth in the tenure regulations of the policies of the Board of Regents and in the approved statutes or bylaws of an institution (BoR Minutes, 1974-75, pp. 304-313; 1982-83, p. 23).

### 8.3.9.1 Grounds for Removal

A tenured or non-tenured faculty member may be dismissed before the end of his/her contract term for any of the following reasons, provided that the institution has complied with procedural due process requirements:

1. Conviction or admission of guilt of a felony or of a crime involving moral turpitude during the period of employment—or prior thereto if the conviction or admission of guilt was willfully concealed.
2. Professional incompetency, neglect of duty, or default of academic integrity in teaching, in research, or in scholarship.
3. Unlawful manufacture, distribution, sale, use or possession of marijuana, a controlled substance, or other illegal or dangerous drugs as defined by Georgia laws; teaching or working under the influence of alcohol which interferes with the faculty member's performance of duty or his/her responsibilities to the institution or to his/her profession (BoR minutes 1989-90, pp.384-385).
4. Conviction or admission of guilt in a court proceeding of any criminal drug offense (BoR Minutes, 1989-90, pp. 384- 385).
5. Physical or mental incompetency as determined by law or by a medical board of three (3) or more licensed physicians and reviewed by a committee of the faculty.
6. False swearing with respect to official documents filed with the institution.
7. Disruption of any teaching, research, administrative, disciplinary, public service or other authorized activity.
8. Such other grounds for dismissal as may be specified in the Statutes of the institution.

Each institution, as a part of its statutes, may supplement Regents' policies governing causes for dismissal and procedures for dismissal. Each institution should provide for standards governing faculty conduct, including sanctions short of dismissal, and procedures for the implementation of such sanctions. In the imposition of sanctions, the burden of proof lies with the institution (BoR Minutes, 1951-52, pp. 315-319, pp. 159-60; 1966-67, p. 206; 1969-70, pp. 21-22; 1974-75, pp. 304-313; 1982-83, p. 254).

### 8.3.9.2 Procedures for Dismissal

These procedures shall apply only to the dismissal of a faculty member with tenure, or a non-tenured faculty member before the end of the term specified in his/her contract.

It is intended that the procedures set forth below shall be considered as minimum standards of due process and shall not be construed as a limitation upon individual standards or procedures, consistent with the Policy Manual and Bylaws of the Board, which a USG institution may elect to adopt for its own improvement or to make adjustment to its own particular circumstances. Such additional standards or procedures shall be incorporated into the statutes of the institution.

The president may at any time remove any faculty member for cause. Cause or grounds for dismissal are set forth in Section 8.3.9.1 of this Policy Manual and in the approved statutes or bylaws of an institution. Whenever the words "president" or



DEFENDANT'S
EXHIBIT
B-2



RESPONDENT
EXHIBIT
B

"administration" are used in these procedures, they shall be construed to include the designated representative of the president.

### Preliminary Procedures

The dismissal of a tenured faculty member, or a non-tenured faculty member during his/her contract term should be preceded by:

1. Discussion between the faculty member and appropriate administrative officers looking toward a mutual settlement.
2. Informal inquiry by an appropriate faculty committee which may, upon failing to effect an adjustment, advise the president whether dismissal proceedings should be undertaken; its advisory opinion shall not be binding upon the president.
3. A letter to the faculty member forewarning that he/she is about to be terminated for cause and informing him/her that a statement of charges will be forwarded to him/her upon request. The faculty member may also request a formal hearing on the charges before a faculty committee. Failure to request charges or a hearing within a reasonable time shall constitute a waiver of the right to a hearing.
4. A statement of charges, if requested by the faculty member, framed with reasonable particularity by the president or his or her designated representative. Along with the charges, the faculty member shall be advised of the names of the witnesses to be used against him or her together with the nature of their expected testimony.

### Provision for Hearing Committee

A dismissal as defined above shall be preceded by statement of charges or causes (grounds for dismissal) if so requested, including a statement that the faculty member concerned shall have the right to be heard by a faculty hearing committee.

The Hearing Committee shall consist of not fewer than three (3) or more than five (5) impartial faculty members appointed by the executive committee (or its equivalent) of the highest legislative body of the faculty, from among the members of the entire faculty, as defined in <u>Section 8.1.1 of this Policy Manual</u>, of the institution.

Members of the Hearing Committee may serve concurrently on other committees of the faculty. The Hearing Committee will meet as a body when it is called into session by the chair of the body that selected them either at his/her discretion, or upon the request of the president or the faculty member who is subject to dismissal.

When the Hearing Committee is called into session, it shall elect a chair from among its membership. A member should remove himself/herself from the case, either at the request of a party or on his/her own initiative if he/she deems himself/herself disqualified for bias or interest. Each party shall have a maximum of two (2) challenges without stated cause, provided, however, that all challenges whether with or without cause shall be made in writing and filed with the chair of the Hearing Committee at least five (5) days in advance of the date set for the hearing.

The chair shall have the authority to decide whether a member of the committee is disqualified for cause. If the chair determines that a member is so disqualified or if a committee member removes himself/herself from a case, the replacement shall be made in the same manner as the original committee was selected. If the chair is thus removed, the committee shall elect a new chair after committee replacements have been appointed. A minimum of three (3) members is required for any action to be taken.

### Dismissal Procedures

In all instances where a hearing is requested, the following hearing procedures shall apply:

1. Service of notice of the hearing with specific reasons or charges against the faculty member together with the names of the members of the Hearing Committee shall be made in writing at least twenty (20) days prior to the hearing. The faculty member may waive a hearing or he/she may respond to the charges in writing at least five (5) days in advance of the date set for the hearing. If a faculty member waives a hearing, but denies the charges or asserts that the charges do not support a finding of adequate cause, the Hearing Committee shall evaluate all available evidence and rest its recommendation upon the evidence in the record.
2. The Hearing Committee, in consultation with the president and the faculty member, may exercise its judgment as to whether the hearing should be public or private.
3. During the proceedings the faculty member and the administration shall be permitted to have an academic advisor and/or counsel of his/her choice. The Hearing Committee will be permitted to have advisory counsel.
4. At the request of either party or the chair of the Hearing Committee, a representative of a responsible education association shall be permitted to attend as an observer.
5. A tape recording or transcript of the proceedings shall be kept and made available to the faculty member and the administration in the event an appeal is filed.
6. An oath or affirmation shall be administered to all witnesses by any person authorized by law to administer oaths in the State of Georgia.
7. The Hearing Committee may grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.
8. The faculty member and the administration shall be afforded a reasonable opportunity to obtain necessary witnesses and documentary or other evidence.
9. The faculty member and the administration will have the right to confront and cross-examine all witnesses. Where the witness cannot or will not appear but the Committee determines that the interests of justice require the admission of

his/her statement, the Committee will identify the witness, disclose his statement and if possible provide for interrogatories.

10. The Hearing Committee will not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available. All questions relating to admissibility of evidence or other legal matters shall be decided by the chair or presiding officer.

11. The findings of fact and the decision of the Hearing Committee will be based solely on the hearing record.

12. Except for such simple announcements as may be required covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member or administrative officers should be avoided until the proceedings have been completed, including consideration by the Board of Regents in the event an appeal is filed. The president and the faculty member will be notified in writing of the decision and recommendation, if any, of the Hearing Committee.

13. If the Committee concludes that adequate cause for dismissal has not been established by the evidence in the record, it will so report to the president. If the president does not approve the report, he/she should state his/her reasons in writing to the Committee for response before rendering his/her final decision. If the Committee concludes that an academic penalty less than dismissal would be more appropriate than dismissal, it may so recommend with supporting reasons. The president may or may not follow the recommendations of the Committee.

14. After complying with the foregoing procedures, the president shall send an official letter to the faculty member notifying him/her of his/her retention or removal for cause. Such letter shall be delivered to addressee only, with receipt to show to whom and when delivered and address where delivered. The letter shall clearly state any charges which the president has found sustained and shall notify such person that he/she may appeal to the Board of Regents for review. The appeal shall be submitted in writing to the Chancellor within twenty (20) days following the decision of the president. It shall state the decision complained of and the redress desired. The Board or a committee of the Board shall investigate the matter thoroughly and render its decision thereon within sixty (60) days from the date of the receipt of the appeal or from the date of any hearing which may be held thereon.

15. Upon dismissal by the president, the faculty member shall be suspended from employment without pay from the date of the final decision of the president. Should the faculty member be reinstated by action of the Board of Regents, he/she shall be compensated from the date of the suspension.

## 8.3.9.3 Dismissal of Temporary, Limited Term, or Part-Time Instructional Personnel

Temporary or part-time personnel serving without a written contract hold their employment at the pleasure of the president, chief academic officer, or their immediate supervisor, any of whom may discontinue the employment of such employees without cause or advance notice (BoR Minutes, 1986-87, p. 103).

## 8.3.9.4 Suspension for Violation of State or Federal Laws

When a faculty member of any USG institution is charged with the violation of a state or federal law, or is indicted for any such offense, a thorough review of the circumstances shall be carried out by the president.

In the event a faculty member is temporarily suspended, the administration shall immediately convene an ad hoc faculty committee or utilize the services of an appropriate existing faculty committee for the purpose of hearing an appeal by the faculty member. The appeal shall be submitted in writing in accordance with procedures to be established by the hearing committee, which shall render its decision within ten (10) days from the conclusion of the hearing. Thereafter, any further appeal by the faculty member shall be in accordance with the procedures set forth in Article VIII of the Bylaws of the Board of Regents (BoR Minutes, 1969-70, p. 394).

return to top

## 8.3.10 Faculty Employment Application Forms

An employment application form shall be completed by each person formally applying for a faculty position in a USG institution. The application must be kept on file at the institution concerned. An applicant will be ineligible for employment if he or she has been convicted of a crime involving moral turpitude, unless the applicant has been pardoned as provided by law (BoR Minutes, 1985, p. 266).

return to top

## 8.3.11 Faculty Contract Forms

USG institutions shall use the appropriate official contract forms approved by the Board of Regents, which are contained in Section 4.0, Academic Personnel, of the Academic Affairs Handbook. USG institutions should not use the following contracts for full-time temporary, limited-term, or part-time faculty. The administrative contract should only be used for administrators with professorial rank. Failure to sign and return such contracts within the time period specified therein may be construed as an abandonment of employment rights.

Contracts are specified for the following categories of employees at all USG institutions:

# DEFENDANTS' EXHIBIT B-3

## 5.10 Procedures for Removal of Faculty Members

### 5.10.1 Introduction

Tenured Faculty members, or nontenured Faculty members before the end of their contract term, may be dismissed for any of the following reasons provided that the Institute has complied with procedural due process requirements.

Conviction or admission of guilt of a felony or a crime involving moral turpitude during the period of employment or prior thereto if the conviction or admission of guilt was willfully concealed;

Professional incompetence, neglect of duty, or default of academic integrity in teaching, research, or scholarship;

Sale or distribution of illegal drugs, teaching under the influence of alcohol or illegal drugs, or any other use of alcohol or illegal drugs which interferes with the Faculty members performance of duty or responsibilities to the Institute or to their profession;

Physical or mental incompetence as determined by law or a medical board of three or more licensed physicians and reviewed by the Faculty Status and Grievance Committee;

False swearing with respect to official documents filed with the Institute;

Disruption of any teaching, research, administrative, disciplinary, public service, or other authorized activity.

### 5.10.2 Preliminary Procedures

The dismissal of tenured Faculty members or nontenured Faculty members during their contract term should be preceded by:

Discussion between the Faculty member and appropriate administrative Officers looking toward a mutual settlement.

Informal inquiry by the Faculty Status and Grievance Committee, which may, upon failing to effect an adjustment, advise the President whether dismissal proceedings should be undertaken; its advisory opinion shall not be binding upon the President.

A letter to the Faculty member forewarning that the member is about to be terminated for cause and informing the member that a statement of charges will be forwarded to the member upon request.  The Faculty member may also request a formal hearing on the charges before a Faculty Hearing Committee.  Failure to request charges or a hearing within a reasonable time shall constitute a waiver of the right to a hearing.

A statement of charges, if requested by the Faculty member, framed with reasonable particularity by the President or a designated representative.

### 5.10.3 Provision for Hearing Committee

A dismissal as defined above shall be preceded by a statement of charges or causes (grounds for dismissal) if so requested, including a statement that the Faculty member concerned shall have the right to be heard by a Faculty Hearing Committee.

The Hearing Committee shall consist of not less than three or more than five impartial Faculty members appointed by the Executive Board, from among members of the entire Faculty (as defined by policies of the Board of Regents) of the Institute.

Members of the Hearing Committee may serve concurrently on other committees of the Faculty. The Hearing Committee will meet as a body when it is called into session by the Chair of the Executive Board either at the Chairs discretion or upon request of the President or the Faculty member who is subject to dismissal.

When the Hearing Committee is called into session, it shall elect a Chair from among its membership. Members should remove themselves from the case, either at the request of a party or on their own initiative, if they deem themselves so disqualified for bias or interest.  Each party shall have a maximum of two challenges without stated cause; provided, however, that all challenges whether with or without cause shall be made in writing and filed with the Chair of the Hearing Committee at least five (5) days in advance of the date set for the hearing. The Chair shall have the authority to decide whether a member of the Committee is disqualified for cause.  If the Chair determines that members are so disqualified or if members remove themselves from a case, the replacement shall be made in the same manner as the original Committee was selected.  If the Chair is thus removed, the Committee shall elect a new Chair after the Committee replacements have been appointed.  A minimum of three members is required for any action to be taken.



RESPONDENT
EXHIBIT
C



DEFENDANT'S
EXHIBIT
B-3

©2008 Georgia Institute of
Technology :: Atlanta, Georgia
30332

## 5.10.4 Dismissal Procedures

In all instances where a hearing is requested, the following hearing procedures shall apply:

Service of notice of the hearing with specific reasons or charges against the Faculty member together with the names of the members of the Hearing Committee shall be made in writing at least twenty (20) days prior to the hearing. The Faculty member may waive a hearing or may respond to the charges in writing at least five (5) days in advance of the date set for the hearing. If a Faculty member waives a hearing, but denies the charges or asserts that the charges do not support a finding of adequate cause, the Hearing Committee shall evaluate all available evidence and rest its recommendation upon the evidence in the record.

The Hearing Committee, in consultation with the President and the Faculty member, may exercise its judgment as to whether the hearing should be public or private.

During the proceedings the Faculty member and the Administration shall each be permitted to have an academic advisor and/or counsel of their choice. The Hearing Committee shall be permitted to have advisory counsel.

At the request of either party or the Chair of the Hearing Committee, a representative of a responsible educational association shall be permitted to attend as an observer.

A tape recording or transcript of the proceeding shall be kept and made available to the Faculty member and the Administration in the event an appeal is filed.

An oath or affirmation shall be administered to all witnesses by any person authorized by law to administer oaths in the State of Georgia.

The Hearing Committee may grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.

The Faculty member and the administration shall be afforded a reasonable opportunity to obtain necessary witnesses and documentary or other evidence.

The Faculty member and the Administration will have the right to confront and cross-examine all witnesses. Where the witness cannot or will not appear but the Committee determines that the interests of justice require the admission of the witness statement, the Committee will identify the witness, disclose the statement, and, if possible, provide for interrogatory.

The Hearing Committee will not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available. All questions relating to admissibility of evidence or other legal matters shall be decided by the Chair or presiding officer.

The findings of fact and the decision of the Hearing Committee will be based solely on the hearing record.

Except for such simple announcements as may be required covering the time of the hearing and similar matters, public statements and publicity about the case by either the Faculty member or Administrative Officers should be avoided until the proceedings have been completed, including consideration by the Board of Regents in the event an appeal is filed. The President and the Faculty member will be notified in writing of the decision and recommendation, if any, of the Hearing Committee.

If the Hearing Committee concludes that adequate cause for dismissal has not been established by the evidence in the record, it will so report to the President. If the President does not approve the report, the President should state the reasons in writing to the Committee for response before rendering a final decision. If the Committee concludes that an academic penalty less than dismissal would be more appropriate than dismissal, it may so recommend with supporting reasons. The President may or may not follow the recommendations of the Committee.

After complying with the foregoing procedures, the President shall send an official letter to the Faculty member notifying the member of either retention or removal for cause. Such letter shall be delivered to addressee only, with receipt to show to whom and when delivered and address where delivered. The letter shall clearly state any charges which the President has found sustained and shall notify the Faculty member that an appeal may be made to the Board of Regents for review. The appeal shall be submitted in writing to the Executive Secretary of the Board of Regents within twenty (20) days following the decision of the President. It shall state the decision complained of and the redress desired. The Board of Regents or a committee of the Board shall investigate the matter thoroughly and render its decision thereon within sixty (60) days from the date of the receipt of the appeal or from the date of any hearing which may be held thereon.

Upon dismissal by the President, the Faculty member shall be suspended from employment without pay from the date of the final decision of the President. Should the Faculty member be reinstated by action of the Board of Regents, compensation shall be made from the date of suspension.

## 5.10.5 Relief from Duties during Dismissal Proceedings

The President in consultation with the Executive Board shall determine whether a Faculty member confronted with a dismissal charge shall be temporarily relieved of duties. Unless legal considerations forbid, any such relief from duties will be with pay.

### 5.10.6 Designated Representative

Whenever the word President or Administration is used in these procedures, it shall be construed to include the designated representative of the President.

| « 5.9 Nonreappointments | up | 5.11 Retirement, Disability, Death Benefits, and Insurance » |

Printer-friendly version

# DEFENDANTS'
# EXHIBIT B-4



**Georgia Tech | College of Engineering**

Gary S. May
*Professor and Steve W. Chaddick School Chair*
School of Electrical and Computer Engineering

Dr. Joy Laskar
860 Saints Drive
Marietta, GA 30068

October 6, 2010

Re: Statement of charges—Joy Laskar, Ph.D.

Dear Dr. Laskar:

As a duly designated representative of the President of the Georgia Institute of Technology ("Georgia Tech" or the "Institute") and Chair of the School of Electrical & Computer Engineering, I am responding to your request for a statement of charges against you. This letter also contains information concerning the policies and procedures for disciplinary action for the Board of Regents of the University System of Georgia and the Institute. Pursuant to your request, you will be provided a formal hearing on the charges before the Faculty Hearing Committee. We propose to schedule that hearing at the earliest opportunity.

<u>Policies and Procedures</u>

The Policies of the Board of Regents of the University System of Georgia (the "Board of Regents Policy") for the removal of faculty members provides that:

> A tenured or non-tenured faculty member may be dismissed before the end of his/her contract term for any of the following reasons, provided that the institution has complied with procedural due process requirements:

> 2. Professional incompetency, neglect of duty, or default of academic integrity in teaching, in research, or in scholarship.

> 6. False swearing with respect to official documents filed with the institution.

Board of Regents Policy Manual (the "Manual"), § 8.3.9.1

The Institute's Faculty Handbook (the "Handbook") provides similar procedures for the removal of faculty members. Specifically, Section 5.10.1 provides that:

> Tenured Faculty members, or nontenured Faculty members before the end of their contract term, may be dismissed for any of the following reasons provided that the

School of Electrical and Computer Engineering
Georgia Institute of Technology
Atlanta, Georgia 30332-0250 U.S.A.
PHONE 404.894.2902  FAX 404.894.4641
www.ece.gatech.edu

*A Unit of the University System of Georgia*       *An Equal Education and Employment Opportunity Institution*



DEFENDANT'S
EXHIBIT
B-4



RESPONDENT
EXHIBIT
D

Institute has complied with procedural due process requirements.

- Professional incompetence, neglect of duty, or default of academic integrity in teaching, research, or scholarship;
- False swearing with respect to official documents filed with the Institute;
- Disruption of any teaching, research, administrative, disciplinary, public service, or other authorized activity.

Finally, the Board of Regents Policy provides that:

> The president of an institution may at any time remove any faculty member or other employee of an institution for cause. Cause shall include willful or intentional violation of the policies of the Board of Regents or the approved statutes of an institution. Further causes or grounds for dismissal are set forth in the tenure regulations of the policies of the Board of Regents and in the approved statutes or bylaws of an institution[.]

Manual, § 8.3.9

The Statement of Charges against you is as follows:

**Charges**

Charge 1:     You are charged with willful violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by using, or causing to be used, Institute monies and other Institute resources to benefit your private, for-profit company, Sayana Wireless LLC ("Sayana").

**Using Institute Monies and Resources to Benefit Sayana**

While employed by Georgia Tech as Director of the Georgia Electronic Design Center ("GEDC"), you founded and retained an ownership interest in Sayana. In your capacity as owner and co-founder of Sayana, you entered into research agreements with certain private companies and ETRI, a research group funded by the South Korean government. Under these research agreements, Sayana was required to import certain electronic chips manufactured by CMP, a French-based manufacturer of specialized electronic components. In your capacity as Director of GEDC, you caused GEDC employees to order electronic chips from CMP in the name of GEDC. Those chips, in turn, were used to satisfy the requirements of contracts between Sayana and ETRI. Georgia Tech ultimately received past due invoices from CMP in the amount of at least $200,000.

In order to pay these invoices, you requested additional funding for GEDC from Mark Allen, then Senior Vice Provost for Research, in the amount of $200,000. When your request was refused, you caused GEDC employees to prepare a document that purported to be a CMP quote in the amount of $50,000 and to submit that quote to Georgia Tech's Accounts Payable as part of the documentation for a payment to CMP. Georgia Tech honored the ostensible invoice and transferred $50,000 to CMP.

Charge 2:    You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by altering GEDC membership agreements.

## Altering GEDC Membership Agreements

In your capacity as Director of GEDC, you caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the Georgia Tech Research Corporation (which would have required the payment of certain overhead expenses to Georgia Tech) to the Georgia Tech Foundation (where the funds were not encumbered by overhead expenses or specific oversight).

Charge 3:    You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to false swearing with respect to official documents filed with the Institute by failing to disclose the true nature of your ownership interest in Sayana.

## False Swearing on the Institute's Conflict of Interest Form

Despite having founded and retained an ownership interest in Sayana, you failed to disclose the true nature of your ownership interest in Sayana.  In your 2007 Conflict of Interest disclosure, you indicated that you were an "advisor" to Sayana, spending less than one day a month engaged in Sayana business. In your 2008 Conflict of Interest disclosure, you indicated that you were a "co-founder" of Sayana but spent less than one day a month working for Sayana.  In your 2009 Conflict of Interest disclosure, you indicated that you were a "co-founder" of Sayana but spent less than one day a month working for Sayana and played no role in the purchase of the company's goods or services.

Certain documents and email exchanges indicate that you played an active role in the management and direction of Sayana, and that you had signatory authority to enter into contracts on behalf of the company.   Documents also demonstrate that you worked substantially in excess of one day per month on Sayana business.  These activities also violate section 8.2.15 of the Manual.

Charge 4:    You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech students and other resources from certain research contracts.

## Diverting Institute Resources from Research Contracts

Research contracts between Sayana and ETRI provided that certain individuals would spend all of their working time (i.e., 100% time) in the performance of work required by the contract.  Many of the individuals identified in the research contracts between Sayana and its corporate and foreign government partners held positions at Georgia Tech under your supervision, including graduate research assistants, postdoctoral fellows and research engineers.  These individuals were supported by Georgia Tech at 100% time, but were diverted from Georgia Tech's projects by their full time assignment to Sayana work.

Charge 4:    You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech resources to benefit Sayana.

### Use of Institute Resources to Benefit Sayana

Certain evidence demonstrates that you used, and caused others to use, Institute offices, laboratory space, equipment, and computer and networking resources to conduct research and other business on behalf of Sayana without Georgia Tech authorization.  As required by Georgia Tech policy, you failed to establish a cost center or enter into lease/rental agreements with the Institute.

The witnesses who may testify against you on these charges are as follows:

Mark Allen
Stephen Fleming
Jilda Garton
Edward Gebara
Melissa Hall
Phillip Hurd
Patrick Jenkins
Gary May
Stephane Pinel
Lauren Robb
Gary Schuster
Eric Trevena
Christopher D'Urbano
Kevin Wozniak

Sincerely,

Gary S. May
Professor and Steve W. Chaddick School Chair
School of Electrical & Computer Engineering

C:     R. Bras
        C. Frankel
        P. McKenna
        R. Mick
        G. Parker
        K. Wasch

# DEFENDANTS' EXHIBIT B-5



**Georgia Institute of Technology**

The H. Milton Stewart School
of Industrial & Systems Engineering

May 7, 2011

Dr. Bud Peterson, President
Georgia Institute of Technology
CAMPUS

Dear President Peterson:

This letter summarizes the findings of the dismissal hearing committee in the matter of Professor Joy Laskar. The committee heard approximately twelve hours of testimony and argument, and considered the rather large number of exhibits assembled by both the Institute and Professor Laskar. The members have deliberated in committee for approximately eight hours, and have spent uncounted hours reviewing exhibits, court reporter transcripts and their own notes.

The dismissal hearing committee is a committee of the General Faculty of the Institute, and is guided by chapter 5.10 of the Georgia Tech Faculty Handbook. It is responsible to see that, in the case of the faculty member facing dismissal, the evidence, both for and against, has been weighed carefully to determine whether or not dismissal is warranted.

In the case of Professor Laskar, the Institute has made five specific charges which relate to the Georgia Electronic Design Center (GEDC) and to the company Sayana Wireless. Professor Laskar directed GEDC and in that capacity reported directly to Dr. Mark Allen, Senior Vice Provost for Research. In addition, Professor Laskar, as a Georgia Tech ECE faculty member, reported to the ECE School Chair, Professor Gary May. Finally, Professor Laskar was a founder, co-owner and manager of Sayana.

With regard to each of the five specific charges, our findings are summarized below and explained in greater detail in the attached report.

**Charge 1, GT Claims:** (1) Chips purchased from a French chip fabricator, CMP, by Georgia Tech for GEDC at Laskar's behest were used to satisfy requirements of a contract between Sayana and a Korean entity, ETRI. (2) Laskar caused a forged quote to be prepared, in order to generate a purchase order to CMP, which subsequently led to an invoice that was honored by Accounts Payable.

**Conclusion:** The first part of the charge 1 claim, regarding the chips shipped to ETRI, is proven. The chips shipped to ETRI were purchased by Georgia Tech, and there is no evidence that title to these chips was ever transferred to Sayana. There is some evidence that this may have been a common practice for start-up companies in GEDC under Laskar's leadership.

The second part of charge 1, regarding the falsified quote, is not proven. We find no direct evidence Laskar caused the quote to be fabricated.

**Charge 2, GT Claims:** Laskar caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the GTRC to the GT Foundation.

**Conclusion:** The charge is not proven. If GEDC membership agreements for Education Members were altered from their original form to show a GT Foundation routing and account number, this would have been appropriate given GEDC bylaws and would not have constituted professional incompetence or neglect of duty.

Atlanta, Georgia 30332-0205 U.S.A.                    PHONE: 404.894.2300
WEB SITE: http://www.isye.gatech.edu                 FAX: 404.894.2301

*A Unit of the University System of Georgia*          *An Equal Education and Employment Opportunity Institution*



RESPONDENT EXHIBIT E

DEFENDANT'S EXHIBIT B-5

● Page 2                                                                    May 6, 2011

However, Laskar's documented attempt to subvert the GT Foundation rules regarding deliverables was, nonetheless, a serious breach of GT policy.

**Charge 3, GT Claims:** Submitted COI forms for 2007-8-9 fail to disclose the full extent of Laskar's involvement in Sayana.

**Conclusion:** This charge is proven, the submitted COI forms did not fully disclose the extent of Laskar's participation in Sayana, nor the clear conflicts that were created in the case of ETRI. However, testimony of May and Allen indicates that each of them knew of Laskar's involvement with Sayana, and neither pursued any concern about potential conflicts.

**Charge 4, GT Claims:** Individuals under Laskar's supervision who were paid full time by Georgia Tech were diverted from Georgia Tech projects to a full time assignment to Sayana work required to satisfy a contract from ETRI.

**Conclusion:** This charge is not proven, i.e., while it is possible that Institute resources were diverted, it is not proven. However, it is clear that Sayana received payment for work that actually was performed (and paid for) by Georgia Tech, and that Sayana failed to properly cite the original sources for the data contained in the reports to ETRI.

**Charge 5, GT Claims:** Sayana was using GT offices, lab space, equipment, and IT resources for its own research and its own business without the GT authorization that would have been granted with a cost center or lease/rental agreement with the Institute.

**Conclusion:** The charge as written is proven. There is evidence that other startup companies and members used Georgia Tech resources as well under Laskar's leadership, without raising flags.

**Recommendation:** These violations are sufficiently egregious to warrant dismissal. While the climate in GEDC may have encouraged some of these violations, Professor Laskar's leadership position in the GEDC gave him a particular responsibility to set an example and to insure that such violations did not occur.

The committee would welcome an opportunity to discuss its findings and other concerns in person.

Sincerely,

Leon F. McGinnis
Professor, ISyE and Committee Chair

Sean Thomas
Research Technologist II, GTRI-ATAS

Sigrun Andradottir
Professor, ISyE

Linda Viney
Principal Research Engineer, GTRI-ELSYS

Enc: Joy Laskar Dismissal Hearing Committee Final Report

**Dismissal Hearing for Joy Laskar**
**Hearing Committee Final Report**
**6May2011**

This report summarizes the committee's evaluation of the evidence and conclusions regarding the charges presented.  In this report JLxxx refers to an exhibit presented by Laskar, and GTxxx refers to an exhibit presented by the Institute.

**Charge 1:** You are charged with willful violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by using, or causing to be used, Institute monies and other Institute resources to benefit your private, for-profit company, Sayana Wireless LLC ("Sayana").

**GT claim:** Chips purchased from CMP by Georgia Tech for GEDC at Laskar's behest were used to satisfy requirements of a contract between Sayana and ETRI.  Further, Georgia Tech ultimately received past due invoices from CMP, and in attempting to convince Georgia Tech to cover these invoices from non-GEDC resources, Laskar caused a forged CMP quote to be prepared, in order to generate a purchase order, which subsequently was honored by Accounts Payable.

**Laskar response:** GTRC is a shareholder and co-owner of Sayana.  Georgia Tech benefited from all the CMP chips it paid for.  The total value of chips sent to ETRI was less than the total amount Sayana paid for CMP chips.  Other faculty start-up companies used Georgia Tech resources in the same manner as Sayana.  Laskar did not have any involvement in the creation of the falsified quote.

**In Evidence:**  Laskar concedes that chips with total value of $259,500 were shipped to ETRI in 2006-2008 (at JL214).  Laskar further concedes that no payments for chip fabrication were made by Sayana prior to 2009 (at JL215).

The sworn statement of Dr. Paul Hessler (at JL351) asserts that it was common practice in GEDC for faculty with start-up companies to use unrestricted Georgia Tech funds to support their research (including support for graduate students), and for the resulting prototypes and building blocks to be made available to potential commercial partners, provided said chips had no resale value.

With respect to the forged quote, Laskar approached Allen for $200K, then $100K, then $50K (GT918, GT924, GT928).  Allen made the decision at that point to provide the $50K for the sake of the students (GT90).

Georgia Tech paid $50K for a CMP chip run in July 2007 (GT880, GT891, GT892).
The order was made with no PO number and not encumbered (GT903).
There is evidence that the quote was fabricated (GT934-GT940).
A note on the invoice (GT880) asks Cathy if the invoice was paying for goods or services and mentions that it was hard to tell.  The note also asked if it was ok to pay.  The invoice was generated on 10 December 2009, but the chip run labeled GT_Jul2007 and the price $50,000 are clearly stated.

Attachment - 1

The Final Report for Contract 2 between Sayana and ETRI refers to a tape out in July 2007 (GT376).

On 401 of the transcript, Allen states that obviously they were acting in good faith in paying the invoice. Allen acknowledges that the date of payment for July 2007 was clear on the invoice (see also GT880). When asked if it was his expectation for someone in accounting to review the actual text of an invoice before paying to make sure it matches the purchase order, Allen responded that he did not know how far they would have checked the work. There was not at that time any suspicion of wrongdoing.

There is evidence Laskar misled Allen (GT0909, GT0918, GT0924, GT0925, GT0928). There is also evidence that Laskar knew of the need for a quote (GT930).

**Conclusion:** The first part of the charge 1 claim, regarding the chips shipped to ETRI, is proven. The chips shipped to ETRI were purchased by Georgia Tech and there is no evidence that title to these chips was ever transferred to Sayana. There is some evidence that this may have been a common practice for start-up companies in GEDC under Laskar's leadership.

The second part of charge 1, regarding the falsified quote, is not proven. We find no direct evidence Laskar caused the quote to be fabricated.

**Charge #2:** You are charged with the violation of the policies of the board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by altering GEDC membership agreements.

**GT Claim:** Laskar caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the GTRC to GT Foundation.

**Laskar Response:** Laskar claims that GT had grandfathered the GEDC from the rules for running a Center at GT, that GT knew that GEDC was counting on membership funds to pay down GEDC debt, and that Laskar left to the sponsor the final decision on whether funds should be a gift or a research contract.

**In Evidence:**
BAE Membership Agreement (GT0945- GT0954)
Jan-Feb 2009 there is correspondence indicating Laskar has discussions with BAE about a GEDC membership; BAE is sent agreement and payment instructions for an Education Membership for $100K. BAE signs membership agreement. Sept 2009, Laskar contacts BAE (Stroili) looking for confirmation of membership renewal in 1Q10. Laskar then corresponds with Evans, Subject: BAE Renewal, asking him to put together a list of what they got, saying to quote Frank "we can make shit up...". Evans sends a list of undisputed benefits to Laskar and asks "should we indicate that they had a student fellow?" Witness testimony from Philip Hurd relating to GT0945 stated that the Appendix to the BAE membership agreement had been modified, specifically (GT0948), the Appendix in it refers to specific instructions on where to send the money .. says send this to the Georgia Tech operating account at .... We traced that routing and account number back and that is actually the Foundation account rather than a Georgia Tech

operating account. When we compared it with the template from GTRC, the Appendix was very much different in GTRC's version.

**Finding:** BAE was a GEDC Education Member which allows for membership payment using unrestricted funds. Therefore the BAE membership funds should have been sent to the GT Foundation account. These types of funds are not allowed to require deliverables or IP rights (GT0057); the question is whether the fabrication of what BAE received for their membership was evidence that the unrestricted funds were misused. There is evidence that shows suspicion but not conclusive evidence that deliverables or IP were granted to BAE in exchange for their Education Membership.

There is credible evidence that Laskar attempted unsuccessfully to cause certain GEDC research opportunities to be converted from contracts to GTF gifts, specifically that he tried to divert a Qualcomm GTRC contract to a GT Foundation grant. Laskar's actions with Qualcom were unprofessional and may have damaged Georgia Tech's reputation and credibility. This indicates a pattern of behavior in which Laskar attempted to use the GT Foundation as a way to avoid GTRC indirect costs.

**Conclusion:** The charge is not proven. If GEDC membership agreements for Education Members were altered from their original form to show a GT Foundation routing and account number, this would have been appropriate given GEDC bylaws and would not have constituted professional incompetence or neglect of duty. However, the attempt to subvert the GT Foundation rules regarding deliverables was, nonetheless, a serious breach of GT policy.

**Charge #3:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to false swearing with respect to official documents filed with the Institute by failing to disclose the true nature of your ownership interest in Sayana.

**GT Claim:** Submitted COI forms for 2007-8-9 fail to disclose the full extent of Laskar's involvement in Sayana. In particular, Laskar had ownership interest in Sayana, was active in managing and directing Sayana, and his level of effort devoted to Sayana was more than the claimed one day per month.

**Laskar Response:** Laskar may have been careless in filling out his COI forms, but GT representatives (including Allen and May) knew of Laskar's status with Sayana. There is no proof that Laskar devoted more than one day per month to Sayana. May did not ask follow-up questions to Laskar regarding Sayana, and Laskar answered Garton's questions.

**In Evidence:** (GT1040-GT1082)
Laskar GIT COI form signed 07/23/07 reports yes on #1 (consulting or financial relationship with sponsor on his research) and yes on #2 (managerial or financial interest with company that does business with the Institute). The COI is signed by Gary May on 08/02/2007. His explanations include #1 technical advisor to Infinera Corp. and CTO at Quellan Corp; #2 co-founder of Quellan and serve on the BOD and advisor to Sayana Wireless an early stage WPAN Company (wireless personal area network). (GT1031-1033).

Laskar GIT COI form signed 07/3/08 reports no on #1 and yes on #2. He reports CTO at Quellan Corp and co-founder of Sayana (less than 1 day/month); goes from Advisor of Sayana to co-founder. (GT1034).

Laskar COI Form was marked "no" for #1, .. receive personal compensation from business ... related to your administrative, ... responsibilities at the Institute AND "no" for #4 .. engaged in any other activities .... that could be perceived to have potential for creating a conflict ... with the Institute responsibilities; this was not signed or dated, it appears to be an electronic form. (GT1036-1037)

Jan 2010, Garton corresponds with Laskar about his Annual COI and asks him to update to include Sayana relationship. Laskar states he is founder and Chairman of Sayana and that Sayana has no overlap of personnel but has hired GT alumni and coops (GT1038). April 2010, Laskar advises Pinel on how to respond to OSP on question regarding activities in Sayana (GT1039). Evidence shows that Sayana did have overlap of personnel.

Evidence shows Laskar actively managing Sayana from 2006 through 2010: Laskar discussing Sayana strategy with Pinel. Sept 2006, Laskar correspondence with Chang-Ho regarding W. Lee (ETRI) visit and his intent to fund GEDC $200K/year, Laskar wants to know if the funding will impact Sayana and if it will he states "I would vote for Sayana over GEDC". Sept 2006 correspondence between Pinel and Laskar about invoices and quote for ETRI. Dec 2006, March 2007, July 2007 correspondence between Pinel and Laskar about general Sayana day-to-day business details. July 2007 copy of sample employment offer letter on Sayana letterhead. July 2009 Sayana receives $280K for CRA with FCI and invoice signed by Laskar, President and Manager (P&M). Feb 2010, Sayana $70K invoice to FCI signed by Laskar, P&M. A fax, dated Jan 20, 2010, of a Development Agreement between Sayana and Microsoft signed by Laskar, P&M. Invoice to Microsoft for $250K signed by Laskar P&M. Invoice to Samsung dated April 19, 2010, for $156.2K signed by Laskar, P&M.

Finding: The evidence shows:
1) Laskar made false statements on his COI form signed 07/23/07 when he stated he was an advisor to Sayana and on his July 2008 COI when he stated he was co-founder of Sayana with less than 1 day/month involvement. His email correspondence indicated he was making management decisions from as early as Sept 2006 and that he was involved more than 1 day/month.
2) On his COI form (GT072-073) he indicated he did not engage in any activities that could be perceived to have potential for creating a conflict with his Institute responsibilities, and this was shown to be false and that he indeed did engage in activities that were a conflict of interest.
3) In his correspondence with Garton in Jan 2010, he states he has no overlap of personnel but Pinel is clearly working for Sayana and GT.
4) He conducted Sayana business routinely using his GT email, evidently his GT computer, and during normal business hours, and did not compensate Georgia Tech for the use of their facilities.
5) Defensive cross of Garton, May, & Allen showed they all knew of Laskar's involvement with Sayana.

Conclusion: This charge is proven, the submitted COI forms did not fully disclose the extent of Laskar's participation in Sayana, nor the clear conflicts that were created in the case of ETRI. However, testimony

of May and Allen indicates that each of them knew of Laskar's involvement with Sayana, and neither pursued any concern about potential conflicts.

**Charge #4:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech students and other resources from certain research contracts.

**GT Claim:** Individuals under Laskar's supervision who were paid full time by Georgia Tech were diverted from Georgia Tech projects to a full time assignment to Sayana work required to satisfy a contract from ETRI.

**Laskar Response:** In the written response to this charge, Laskar stated that individuals who worked on Sayana's ETRI contract were doing so within the Georgia Tech guidelines for outside work (cited as 1 day per month, but actually 1 day per week for faculty, and 20 hours per month for a co-op). In addition, in the course of the witness testimony, Laskar's attorney stated on several occasions (though without evidence) that all the information contained in the reports to ETRI had been previously published and was therefore "in the public domain and available for anyone to use."

**In Evidence:**
Sayana submitted a proposal to ETRI describing work to be done in two phases: phase 1, August-December, 2006, involved "evaluation and characterization of 90 nm CMOS for 60 GHz applications" (at GT0174), and phase 2, January-December, 2007 for the "development of a 60GHz integrated transceiver" (at GT0174). The statement of work calls for the following:
"A first tape-out will be dedicated to …" (at GT0174)
"A complete 60 GHz integrated module prototype will be developed…" (at GT0175)
Phase 1 requirement is "Access to 90 nm CMOS process…for a value of $150,000" (at GT 0176)
Phase 2 requirement is "Access to 90 nm CMOS process for a total value of $180,000" (at GT0177)
The proposal contains budget details for 2006 (at GT0178) showing that Sayana will contribute $100,000 toward "Direct labor/Design" and ETRI will contribute $100,000, for a total of $200,000. This budget breakdown is accompanied by a note stating "The total expenses related to "Direct labor/Design services," which would be $200,000, corresponds to the support of five engineers during the August-December 2006 period."

Subsequently, Sayana entered into a contract with ETRI ("collaborative research agreement" at GT0180) on 25Sep06. This contract has exactly the same phase 1 timeline and budget as the proposal (compare GT0178 and GT0187), with the exception of the note; the expenses related to "Direct labor/Design services," still at $200,000, is to fund four engineers, not five. The contract also identifies the Sayana staff, showing Pinel, Sarkar, Padmanava, and Mukhopadhyay as the only individuals with a 100% load in phase 1. Evidence shows that Pinel (at GT1099), Sarkar (at GT1105), Padmanava (at GT1106), and Mukhopadhyay (at GT1098) all were employees of Georgia Tech, paid 100% from Georgia Tech funds during the period August-December, 2006.

The interim report for this contract (at GT0200) shows the same four engineers with a 100% load.

---

Attachment - 5

Neither the interim report (at GT0198) nor the final report for phase 1 (at GT0235) cite any thesis or dissertation, any publication or paper submitted for publication, or any public presentation as the source of the data contained in the report.

**Analysis:** Both the proposal and the contract clearly state that the $200,000 for "Direct labor/Design services" is to support the engineers performing these services. It would be very difficult to construe these notes as addressing anything other than direct salary expense. If the four engineers assigned to the ETRI contract worked a full five months (August to December), and their labor cost (as stated in the proposal, and subsequently funded in the contract) was $200,000 then their equivalent full time monthly salary would be $200,000/(4x5) = $10,000, which might be high, but not unreasonable for a design engineer on the leading edge of a potentially very valuable technology. On the four other hand, if these four individuals all were allowed to work a maximum of one day per week (the contemporary Georgia Tech guideline for faculty work outside Georgia Tech), their equivalent full time salary would be five times higher, i.e., $50,000 per month. This does not seem reasonable for a direct salary expense, or even for a fully burdened salary rate.

**Finding:** The most straightforward interpretation of the evidence is that Georgia Tech employees were not diverted from their Georgia Tech work, but the results of their Georgia Tech work was appropriated by Sayana to satisfy a contract with ETRI. The ETRI contract appears to reimburse Sayana for this Georgia Tech work, but Sayana did not then reimburse Georgia Tech. Laskar's attorney claimed the information in the ETRI reports was in the public domain, but the ETRI reports failed to cite any original sources.

**Conclusion:** This charge is not proven, i.e., while it is possible that Institute resources were diverted, it is not proven. However, it is clear that Sayana received payment for work that actually was performed (and paid for) by Georgia Tech, and that Sayana failed to properly cite the original sources for the data contained in the reports to ETRI.


**Charge #5:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech resources to benefit Sayana.

**GT Claim:** Sayana was using GT offices, lab space, equipment, and IT resources for its own research and its own business without the GT authorization that would have been associated with a cost center or lease/rental agreement with the Institute.

**Laskar's Response:** Sayana was treated no different than any other GEDC start-up company. GEDC bylaws expressly provided access to Members, which in practice meant office space, access and use of lab equipment and design tools. Georgia Tech never required cost centers or lease/rental agreements with any GEDC Member or start-up. From mid-2008 onward, GEDC operations were reviewed regularly by

both May and Allen.  There was so much confusion about the rules applicable to GEDC that an email was sent to all affiliated faculty regarding what was permissible for faculty start-ups.

**In Evidence:**
Sayana employees used GT space, computers, software, and other resources (GT1113-1154).  The documented use of the Cadence tool was in violation of the license agreement (GT1109-1112).
In a sworn statement, Paul Hesler states that his Georgia Tech startup company "GTronix was eligible for automatic membership in GEDC" and that "GTronix was not required to pay membership dues for its GEDC membership because it was a startup company through Georgia Tech." However, in the GEDC bylaws, there is no mention of spin-out companies being 'automatic' members.

In a letter dated Dec. 16, 2008, Pinel announces Sayana's intent to apply for a full GEDC membership (GT1017).  The corresponding gift to the GTF was provided in February 2009 (GT1019-1020), suggesting an educational membership according to the GEDC bylaws (GT0057).  The GEDC bylaws further state that ``All Members shall receive...Access to GEDC resources, personnel, and activities specified by GEDC from time to time" (GT0058).  However, the precise definition of "Access" is not provided.  May's testimony indicates that other GEDC members used equipment, software, and facilities (transcript 469-472).

**Analysis:**  There is nothing in the bylaws about spin-out membership and no evidence of Sayana's GEDC membership until February 2009.  Furthermore, Sayana's documented use of Georgia Tech resources does not seem consistent with the statement about "Access...from time to time" in the GEDC bylaws.  However, oversight and reviews of GEDC operations with the Senior Vice Provost for Research did not appear to raise red flags with respect to the presence of and treatment of spin-outs and members.

**Conclusion:**  The charge as written is proven.  There is evidence that other startup companies and members used Georgia Tech resources as well under Laskar's leadership, without raising flags.

# DEFENDANTS' EXHIBIT B-6

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

AUG - 9 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

LEANNE M. GILBERT,            *
                             *
        Petitioner,          *
                             *
   v.                        *   Civil Action No. 2010-CV-191728
                             *
BOARD OF REGENTS OF THE      *
UNIVERSITY SYSTEM OF         *
GEORGIA, and MARK G. ALLEN,  *
in his official capacity as the Custodian *
Of Records of Georgia Electronic *
Design Center of the Georgia *
Institute of Technology,     *
                             *
        Respondents.         *

## FINAL ORDER

The Court has reviewed all of the pleadings in this matter, as well as

the exhibits attached thereto and has heard oral arguments from both parties.

After considering the record and the argument presented by the parties, the

Court enters the following final order.

On July 19, 2010, Petitioner requested that Respondents provide her

with copies of all emails to or from Dr. Joy Laskar from 2003 to the present

(Request No. 5).  On August 30, 2010, Petitioner requested all emails

"reviewed, segregated for review, or made available for review" in

connection with an internal audit which was conducted in early 2010.





On September 20, 2010, Petitioner requested that Respondent provide her with a variety of invoice and payment records (Requests Nos. 1 through 12).

On October 4, 2010, Petitioner filed a lawsuit in this Court, alleging that Respondents had violated the Open Records Act (ORA), O.C.G.A. § 50-18-70 *et seq.*, based on their failure to fully respond to her July 19, 2010 and September 20, 2010 ORA requests.  On April 18, 2011, Petitioner amended her complaint, to allege that Respondents were similarly in violation of the ORA based on their failure to provide a full response to Petitioner's August 30, 2010 ORA request and to another ORA request that Petitioner submitted on February 8, 2011.[1]

The ORA requires that any request for records must be responded to in writing within three business days.  O.C.G.A. §§ 50-18-70(f) and 50-18-72(h).  The ORA authorizes the Court to award reasonable attorneys' fees and other litigation costs if the Court finds that either party has acted "without substantial justification."  O.C.G.A. § 50-18-73(b).  In making this determination, the Court shall consider the record as a whole. *Id.*

Petitioner has received all the records she requested in her July 19 and September 20, 2010 ORA requests.  Respondents responded to the July 19 request by making the hard-drive from Dr. Laskar's computer available for

---

[1]     Petitioner no longer presses her claim here as to the February 8, 2011 ORA request, and therefore that particular claim is now moot.

copying.  Respondents responded to the September 20 request by producing

invoices and payment records.  Thus, even assuming that Petitioner could

establish any violation of the ORA, the issue is moot and the Court finds that

the Respondents were substantially justified in their actions in responding to

the July 19 and September 20, 2010 ORA requests in light of the record as a

whole.

The Court finds that the Respondent did not timely respond to

Petitioner's August 30, 2010 ORA request, in that Respondents' written

response was dated September 3, 2010, which was four days after

Respondents' receipt of Petitioner's request.  Therefore, the Court **ORDERS**

Respondents to produce the approximately 515,000 emails sought by

Petitioner in her August 30, 2010 ORA request within twenty days from the

date of this Order, in electronic format as required by O.C.G.A. § 50-18-

70(g).  Based upon their late reply, Respondents may not assert any

exemptions asserted in their September 3, 2010 letter before producing these

documents. *Jaraysi v. City of Marietta*, 294 Ga. App. 6 (2008).  Further,

Petitioner shall reimburse Respondents for the costs associated with the

"search, retrieval, and other direct administrative costs for complying with"

Petitioner's request, O.C.G.A. § 50-18-71(d), which costs Respondents may

assess only after first providing Petitioner with a cost estimate, as required

under O.C.G.A. § 50-18-71.2.  Respondents shall utilize the most economical means available for providing copies of the responsive records. O.C.G.A. §50-18-71(e).

As concerns Petitioner's request for fees, although the Court finds that the Respondents violated the ORA based on their late response to the August 30, 2010 ORA request, the facts in this case are not similar to the extreme situation discussed in *Jaraysi v. City of Marietta*, 294 Ga. App. 6 (2008). Here, Respondents have provided records in response to a total of 72 separate document requests over a period of several months.  Respondents have provided Petitioner with many thousands of documents in response to Petitioner's various ORA requests.  Respondents' formal written response to the August 30, 2010 ORA was only one day late, and the parties had a face-to-face meeting to discuss various ORA issues on August 2, 2010, the day Respondents' formal written response was due.  Based on its review of the record as a whole, the Court finds that Respondents acted with "substantial justification" with regard to the August 30, 2010 ORA request.

**WHEREFORE, IT IS HEREBY ORDERED** that

(a)     Respondents shall produce by electronic means the approximately 515,000 emails sought by Petitioner in her August 30, 2010 ORA request within twenty days from the date of this Order;

4

(b)    Respondents may not assert any exemptions asserted in their

September 3, 2010 letter before producing these documents;

(c)    After Respondent first provides Petitioner with a cost estimate, as

required under O.C.G.A. § 50-18-71.2, Petitioner shall reimburse

Respondents for their reasonable costs for search, retrieval, and other

direct administrative costs for complying with Petitioner's request and

Respondents shall utilize the most economical means available for

providing copies of the responsive records.  O.C.G.A. §§ 50-18-71(d)

and (e); and

(d)    because the Court has found that Respondents acted with substantial

justification in responding to Petitioner's ORA requests, the Petition

for Attorneys' Fees and Litigation Costs is **DENIED.**

**IT IS SO ORDERED**.  This the 8th day of August,  2011.

**DORIS L. DOWNS, JUDGE**
**FULTON SUPERIOR COURT**
**ATLANTA JUDICIAL CIRCUIT**

cc:

Craig M. Frankel, Esq.
Robert P. Marcovitch, Esq.
Gaslowitz Frankel, LLC
4500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA  30308

Julia B. Anderson, Esq.
Department of Law
State of Georgia
40 Capitol Square, SW
Atlanta, GA  30334-1300

DEFENDANTS'
EXHIBIT B-7



## Georgia Institute of Technology

Office of Legal Affairs

Via Email (cfrankel@gadisputes.com)
And U.S. Mail

August 12, 2011

Craig M. Frankel
Gaslowitz Frankel LLC
4500 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308

> RE:   Gilbert v. Board of Regents
> In the Superior Court of Fulton County
> Civil Action File No. 2010CV191728

Dear Mr. Frankel:

Pursuant to Judge Downs' August 8, 2011 order, Georgia Institute of Technology ("Georgia Tech") has copied to an external hard drive the approximately 515,000 emails that were located by Georgia Tech's Department of Internal Auditing in connection with the internal audit to which you referred in your August 30, 2010 Open Records Act ("ORA") request. You may pick up the hard drive upon payment of the enclosed invoice.

In compliance with Judge Downs' order, these documents have been produced without redaction and without exemption. Nevertheless, for the reasons set forth in our briefs filed with the Court, Georgia Tech continues to be concerned about the disclosure of confidential student information, as well as trade secrets and other proprietary information. O.C.G.A. §§ 50-18-72(a)(1) or (b)(1).

Therefore, Georgia Tech requests that you not disclose any of the emails or attachments produced to you in response to your August 30, 2010 ORA request to anyone other than

Georgia Institute of Technology
Atlanta, Georgia 30332-0495 U.S.A.
PHONE 404.894.4812
FAX 404.894.3120

*A Unit of the University System of Georgia    An Equal Education and Employment Opportunity Institution*



DEFENDANT'S
EXHIBIT
B-7

RESPONDENT
EXHIBIT
G-

Craig M. Frankel
August 12, 2011
Page 2

individuals directly involved in the legal representation of Joy Laskar.  In addition, we request that you make every effort not to disclose such protected information when using these documents in any legal proceeding in the future.

Thank you for your cooperation in this matter.

Sincerely,

Kathleen A. Wasch
Managing Attorney

Encl.

C:     Julie Anderson
       Pat McKenna
       David McLaughlin
       Bryan Webb



**Georgia Institute of Technology**

Office of Legal Affairs

Via Email (cfrankel@gadisputes.com)
And U.S. Mail

August 11, 2011

Gaslowitz Frankel LLC
Attn:  Craig M. Frankel
4500 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA  30308-3243
P:  404.892.9797
F:  404.892.1311
cfrankel@gadisputes.com

Re:  Invoice – Production of Records Pursuant to August 30, 2010 Open Records Act Request

| Invoice Date | Description | Amount |
|---|---|---|
| 08-11-2011 | Seagate FreeAgent® GoFlex™ 500 GB external hard drive PN: 9ZF2A2-500;  SN: NA0EMDB2 | $84.98 |
| 08-11-2011 | 9 hours at $38.25/hour to identify, compile, and copy the requested emails, and to verify hard drive content | $344.25 |
|  |  | $ |
|  |  | $ |
|  | Total Amount | $429.23 |

Please make check or money order payable to: Georgia Institute of Technology, tax ID # 58-6002023.

PLEASE REMIT PAYMENT TO:
GEORGIA INSTITUTE OF TECHNOLOGY
Office of Legal Affairs
Attn:  Kathleen A. Wasch
760 Spring Street, NW, Suite 324
Atlanta, GA  30332-0495

Georgia Institute of Technology
Atlanta, Georgia 30332-0495 U.S.A.
PHONE 404.894.4812
FAX 404.894.3120

*A Unit of the University System of Georgia     An Equal Education and Employment Opportunity Institution*

# DEFENDANTS' EXHIBIT B-8

**Julia Anderson**

| | |
|---|---|
| **From:** | Kate Wasch [kate.wasch@legal.gatech.edu] |
| **Sent:** | Wednesday, October 12, 2011 4:25 PM |
| **To:** | Julia Anderson |
| **Subject:** | Fwd: Hearing/Time Limits |

Kate Wasch
Managing Attorney
Office of Legal Affairs
Georgia Institute of Technology
Atlanta, GA  30332-0495
Phone: 404-894-4812

For Express Mail & deliveries:
760 Spring Street, Suite 324
Atlanta, Georgia 30308

Please note that most communications to or from Georgia Tech employees are public records and available to the public and the media upon request under Georgia's broad open records law.  Therefore, this e-mail communication and any response to it may be subject to public disclosure.

**From:** "JohnMarshall" <johnm1237@mac.com>
**To:** "Frankel Craig" <cfrankel@gadisputes.com>, "Kate Wasch"
<kate.wasch@legal.gatech.edu>
**Cc:** "Leon McGinnis" <leon.mcginnis@isye.gatech.edu>, "Reid Tankersley"
<reid.tankersley@carnegie.gatech.edu>
**Sent:** Friday, January 28, 2011 10:56:38 AM
**Subject:** Hearing

Just a preliminary update, it looks like the hearing will start either on March 28th or 29th and go from 9-1 through the 31st. We will likely only have 4 committee members due to international travel commitments of one potential member.

The committee has decided that it likely will need to limit each side to 5 hours. This time would include opening statements and questioning of witnesses(but committee questions to witnesses would not count against either side's time). I would suggest that this should be ample time if both parties will cooperate ahead of time with stipulations regarding exchange of documents and their admissibility. It might also be helpful if each side could agree to a submission to the committee in advance  of their position on the issues, so the committee will be "up to speed" at the beginning of the hearing. I will be happy to work with each of you--I would suggest a sit down to do this--to make this work.

John

John D. Marshall, Jr.
johndmarshall@mac.com
cell:404-702-6234
fax :404-872-1185



RESPONDENT
EXHIBIT
H



DEFENDANT'S
EXHIBIT
B-8

10/12/2011

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the within and foregoing

**MOTION TO DISMISS PETITION FOR WRIT OF CERTIORARI**

**OR IN THE ALTERNATIVE PETITION FOR WRIT OF**

**MANDAMUS** by depositing a copy of the same to be delivered via United

States Mail, addressed as follows:

> Craig M. Frankel
> Robert P. Marcovitch
> LeAnne M. Gilbert
> Gaslowitz Frankel, LLC
> 4500 SunTrust Plaza
> 303 Peachtree Street, N.E.
> Atlanta, GA  30308

This 13th day of October 2011.

JULIA B. ANDERSON
Senior Assistant Attorney General

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

JOY LASKAR, Ph.D.,                    *
                                      *
        Petitioner,                   *
                                      *
v.                                    *    Civil Action No. 2011CV205556
                                      *
THE BOARD OF REGENTS OF               *
THE UNIVERSITY SYSTEM OF              *
GEORGIA,                              *
                                      *
        Respondent,                   *
                                      *
and                                   *
                                      *
G.P. "BUD" PETERSON, in his           *
official capacity as President of the *
GEORGIA INSTITUTE OF                  *
TECHNOLOGY, a Unit of the             *
University System of Georgia,         *
governed by the BOARD OF              *
REGENTS OF THE UNIVERSITY             *
SYSTEM OF GEORGIA,                    *
                                      *
        Defendant.                    *

**FILED IN OFFICE**

**OCT 1 3 2011**

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## BRIEF IN SUPPORT OF MOTION TO DISMISS PETITION FOR WRIT OF CERTIORARI OR IN THE ALTERNATIVE PETITION FOR WRIT OF MANDAMUS

Petitioner filed this Petition for Writ of Certiorari and Petition for

Writ of Mandamus seeking judicial review of the Board of Regents' decision

affirming the decision of Georgia Tech's President, Dr. Peterson, to

terminate Petitioner's employment.  Petitioner has failed to state any legal

basis upon which relief can be granted pursuant to a petition for certiorari or a petition for writ of mandamus.   The decision by a public university to terminate an employee is not subject to judicial review unless the employee can establish that he was denied due process during the course of the termination proceedings.  *Bd. of Regents v. Houston*, 282 Ga. App. 412, 414 (2006).  *See also Bd. of Regents v. Edmunds*, 302 Ga. App. 1, 10-12 (2009) ("the Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill advised personnel decisions.").  While Petitioner may disagree with the Board of Regents' decision, Respondents provided Petitioner with all due process to which he was entitled prior to that decision being made and Petitioner's procedural due process claims fail as a matter of law.  Petitioner has failed to allege any other legal basis upon which he is entitled to any relief against Respondents.

## STATEMENT OF FACTS

Petitioner was appointed to the faculty at Georgia Tech as an assistant professor in 1995.  Petition, ¶ 22.  Petitioner was appointed as an associate professor in 1998 and received tenure in 2002.  *Id*.  In approximately 2003, the Georgia Electronic Design Center ("GEDC") was established and Petitioner was appointed Director.  Petition, ¶ 23.  The GEDC is an inter-disciplinary center at Georgia Tech broadly focused on fostering technology

at the intersection of today's communications applications, wireless/RF, wired/copper and fiber channels.  Petition, ¶ 24.

Each year during his employment, Petitioner entered into a signed written contract with the Board of Regents.  Petition, ¶¶ 29 and 30.  *See also* Respondents' Exhibit A.  The contract includes a provision that: "[t]his agreement is made expressly subject to the applicable state and federal laws and to the statutes and regulations of this institution and to the Bylaws and Policies of the Board of Regents, which are available for inspection upon your request."  Petition, ¶ 30; Respondents' Exhibit A.  A copy of Section 8.3.9 of the Board of Regents Policy Manual is attached hereto as Respondents' Exhibit B.  A copy of Section 5.10 of the Georgia Tech Faculty Handbook is attached hereto as Respondents' Exhibit C.

On approximately May 17, 2010, Dr. Peterson sent a letter to Petitioner notifying him that based on a recent internal audit at the GEDC, "the Institute's Department of Internal Auditing discovered what they believe to be substantial evidence of malfeasance on your part including the misappropriation of Institute resources for the benefit of a company, Sayana Wireless, LLC, of which you are part owner."  Petition, ¶ 41.[1]

---

[1] Although Dr. Peterson initially placed Petitioner on suspension without pay, Petitioner's status was subsequently changed to suspension with pay

On June 15, 2010, Dr. Gary May, Chair of the School of Electrical

and Computer Engineering, notified Petitioner pursuant to Section 5.10 of

the Georgia Tech Faculty Handbook that Georgia Tech intended to initiate

dismissal proceedings.  Petition, ¶ 43.  In that letter, Dr. May said the first

step in the process is "discussion between the Faculty member and

appropriate administrative Officers looking toward a mutual settlement."  *Id*.

Dr. May arranged for Petitioner to meet with the Provost, Dr. Gary B.

Schuster.  The meeting took place on June 24, 2010.  Petition, ¶¶ 43 and 44.

Because no "mutual settlement" was reached, on July 1, 2010, Dr. May

notified Petitioner that he had referred his case to the Faculty Status and

Grievance Committee.  Petition, ¶ 51.  On July 8, 2010, the Faculty Status

and Grievance Committee voted in favor of dismissal proceedings.  *See*

Exhibit C at 1, attached to Petition.

On July 9, 2010, Dr. Peterson notified Petitioner that the Faculty

Status and Grievance Committee had voted in favor of dismissal

proceedings and that Petitioner was entitled to a statement of charges and a

formal hearing upon request.  Petition, ¶ 54.  On July 28, 2010, Petitioner

made a request for a statement of charges and a formal hearing.  Petition,

---

pending a final decision by the Board of Regents.   Petitioner was also
reimbursed for all back pay and benefits.   Petition, ¶ 42.

¶ 55.  Section 5.10.4 of the Georgia Tech Faculty Handbook provides:

"[s]ervice of notice of hearing with specific reasons or charges against the

Faculty member together with the names of the members of the Hearing

Committee shall be made in writing at least twenty (20) days prior to the

hearing."  *See also* Board of Regents Policy Manual 8.3.9.2.

The statement of charges was served on Petitioner and his attorney on

October 6, 2010.  Petition, ¶¶ 56 and 58.  A complete copy of the statement

of charges is attached hereto as Respondents' Exhibit D.  The hearing before

the Faculty Hearing Committee was conducted on March 28, 2011 through

March 31, 2011.  Petition, ¶ 60.  The Faculty Hearing Committee submitted

its report and recommendation to Dr. Peterson on May 7, 2011.  Petition,

¶ 68.  A complete copy of the Faculty Hearing Committee's report and

recommendation is attached hereto as Respondents' Exhibit E.  The

Committee found that charge one was proven in part and that charges three

and five were fully proven.  The Committee found that charges two and four

were not proven.  *Id.*  The Committee made the following recommendation:

> These violations are sufficiently egregious to
> warrant dismissal.  While the climate in GEDC
> may have encouraged some of these violations,
> Professor Laskar's leadership position in the
> GEDC gave him a particular responsibility to set
> an example and to insure that such violations did
> not occur.

*Id.* at 2.  On May 14, 2011, Dr. Peterson notified Petitioner that he had reviewed the Committee's report and recommendation, as well as the record of the hearing, and that he agreed with the Committee's recommendation. Dr. Peterson notified Petitioner that his employment was terminated effective immediately.[2]  Petition, ¶ 71.  On approximately June 3, 2011, Petitioner appealed Dr. Peterson's decision to the Board of Regents. Petition, ¶ 72.  On August 10, 2010, the Board of Regents affirmed Dr. Peterson's decision.  Petition, ¶ 78.

On September 9, 2010, Petitioner filed a Petition for Writ of Certiorari or in the Alternative Petition for Writ of Mandamus in this Court.

## ARGUMENT AND CITATION OF AUTHORITY

A.   *This Court Lacks Jurisdiction To Grant Relief Pursuant To A Petition For Writ of Certiorari Or a Petition for Writ of Mandamus.*

"It is well settled that disputes concerning academic decisions made by public institutions of learning present no justifiable controversy." *Bd. of Regents v. Houston*, 282 Ga. App. 412, 414 (2006) (citing *Woodruff v. Ga. State Univ.*, 251 Ga. 232 (1983).  This judicial restraint

> Stems from confidence that school authorities are able to discharge their academic duties in fairness and with competence.  It is born alike of the

---

[2] Dr. Peterson enclosed a copy of the Faculty Hearing Committee's report and recommendation with his May 14, 2011 letter.  Petition, ¶ 71.

> necessity for shielding the courts from an
> incalculable new potential for lawsuits, . . .
> Absent plain necessity impelled by a deprivation
> of major proportion, the hand of the judicial
> branch [ ] must be withheld.

*Id.* (punctuation and citations omitted).  Furthermore, "[r]esolution of

discretionary policy determinations can best be made by other branches of

government." *Houston*, 282 Ga. at 414 (citations omitted).

The function of a court is not to act as a "super personnel department"

second guessing an agency's employment decision.  *Alvarez v. Royal*

*Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  In other

words, the Georgia courts will not review the final decision of any state

agency to terminate an employee, unless the employee has alleged a due

process "deprivation of major proportion."  282 Ga. at 414.  As discussed in

Section B, *infra*, the undisputed facts show that Respondents complied with

the requirements of due process in providing Petitioner notice and an

opportunity to be heard before the final decision was made to dismiss

Petitioner from his tenured position.  Petitioner has failed to allege sufficient

facts to establish that he suffered any due process violation sufficient to state

a claim upon which relief can be granted.

Petitioner's second enumeration of error is that the Board of Regents'

decision is not supported by "substantial evidence."  There is no statute or

law that supports Petitioner's claim that the Board of Regents' decision is subject to review under a "substantial evidence" standard.  To the contrary, as discussed herein above, the decision is not subject to any review, other than to ensure that Petitioner has not been denied his right to due process, as provided pursuant to the applicable Board of Regents and Georgia Tech policies.

The Georgia Administrative Procedure Act ("APA") provides for review of certain agency decisions, subject to an "any evidence" standard. However, the Board of Regents is not an "agency" subject to the APA. The APA defines an "agency" as "a state board, bureau, commission, department, activity, or officer authorized by law expressly to make rules and regulations or to determine contested cases, except . . . any school [or] college . . . ."  O.C.G.A. § 50-13-2(1).  The APA expressly excludes from its purview any "[r]ules which relate to the employment, compensation, tenure, terms, retirement, or regulation of the employees of the state or of an agency."  O.C.G.A. § 50-13-2(6)(H).  In *Tompkins v. Bd. of Regents*, 262 Ga. 208 (1992), the Georgia Supreme Court held that Board of Regents policies relating to employment matters are not governed by the APA.

Even if this Court were to find that it has jurisdiction to review the merits of the Board of Regents' decision to dismiss Petitioner, the record provides more than "substantial evidence" to support that decision.

As an alternative form of relief, Petitioner asks this Court to grant him a petition for writ of mandamus. O.C.G.A. § 9-6-21(a) provides that "[m]mandamus shall not lie [against any] public officer who has an absolute discretion to act or not to act unless there is a gross abuse of such discretion." The facts alleged in the Petition for Writ of Certiorari or in the Alternative Petition for Writ of Mandamus do not support a claim that Respondents committed a "gross abuse of discretion" in conducting the hearing review process before making the decision to dismiss Petitioner. As such, the facts alleged in the Petition do not support a petition for writ of mandamus.

> B. *Petitioner's Procedural Due Process Claim Is*
> *Subject To Dismissal For Failure To State A Claim*
> *Upon Which Relief Can Be Granted.*

The due process clause under the State Constitution provides the same procedural due process rights in public employment cases as the federal due process clause. *Camden County v. Haddock*, 271 Ga. 664, 665 (1999). *See also* Ga. Const. Art. I, §, ¶ 1 ("No person shall be deprived of life, liberty, or property except by due process of law."). A public employee has a property

interest in continued employment for due process purposes if the

employment is subject to rules or a policy that provides that the employee

may only be dismissed for cause. *Haddock*, 271 Ga. at 665.

Before an employee may be dismissed "for cause," the employee is

entitled to certain due process procedures. However, neither federal nor

state law guarantees any specific procedures. *Edmunds*, 302 Ga. App. at 10-

11 (quoting *Solinet v. Johnson*, 280 Ga. App. 227, 230 (2006)). Due process

is satisfied

> [I]f a party has reasonable notice and opportunity
> to be heard, and to present its claim or defense, due
> regard being had to the nature of the proceeding
> and the character of the rights which may be
> affected by it.

*Edmunds*, 302 Ga. App. 10-11. Additionally, "[p]rocedural due process may

be satisfied by a subsequent remedial proceeding where notice and an

opportunity to be heard are afforded." *Id.* at 11.

Respondents provided Petitioner with a statement of charges and

allotted four days to allow Petitioner to present his case. Petition, ¶¶ 58 and

60. *See also* Respondent's Exhibit D. The Faculty Hearing Committee

found that some of the charges were proven and some were not.

Respondents' Exhibit E. *See also Edmunds*, 302 Ga. App. at 12 ("That this

hearing afforded [Petitioner] an opportunity to be heard is best demonstrated

by the fact that [Petitioner] achieved a partially successful outcome.").

Nevertheless, the Committee recommended that Petitioner be dismissed.

Respondent's Exhibit E.  In this case as in *Edmunds*:

> [T]he evidence establishes that the hearing did
> provide [Petitioner] with the requisite due process
> - i.e., notice and an opportunity to be heard.
> [Petitioner] was represented by counsel at the
> hearing, and he was given the opportunity to
> present documentary evidence and witnesses,
> testify in his own behalf, and cross-examine the
> witnesses for Georgia Tech.

*Id.* at 11-12.

Petitioner has alleged six violations of his procedural due process

rights: 1) failure to comply with pre-hearing procedures; 2) failure to provide

access to witnesses; 3) failure to provide access to material documents;

4) limitation of presentation; 5) pre-hearing publicity; and 6) limited review

by the Board of Regents.  Each of the enumerations of error fails as a matter

of law.

> 1.    *The Preliminary Procedures Complied With*
>       *Due Process.*

Petitioner complains that Respondents failed to comply with the first

two steps of the preliminary procedures as set forth in Section 10.5.2 of the

Georgia Tech Faculty Handbook.  The first step is "[d]iscussion between the

Faculty member and appropriate administrative Officers looking toward a

mutual settlement." Section 5.10.2. The second step is an "[i]nformal inquiry by the Faculty Status and Grievance Committee, which may, upon failing to effect an adjustment, advise the President whether dismissal proceedings should be undertaken; its advisory opinion shall not be binding upon the President." *Id.*

Petitioner admits that he met with Provost Schuster on June 24, 2010. Petition, ¶ 45. Petitioner alleges that Dr. Schuster did not engage in a good faith effort to reach a "mutual settlement" and that he made certain statements which indicated that "no resolution was to be had." Even assuming, solely for purpose of Respondents' Motion to Dismiss, that Petitioner's allegations are true, it was within Dr. Schuster's discretion not to offer any settlement to Petitioner since the facts in this case did not warrant a settlement.

It is undisputed that a Faculty Status and Grievance Committee was convened to review Petitioner's case and that the Committee voted in favor of dismissal proceedings. Petition, ¶ 54. Petitioner apparently contends that the Committee's review was insufficient based on the fact that the Committee received the case on July 1, 2010 and made their recommendation to the President on July 8, 2010. *See* Petition, ¶¶ 51 through 54. Petitioner also complains that Georgia Tech did not disclose

what information was provided to the Faculty Status Committee in connection with their review.

The rules provide that the Faculty Status and Grievance Committee shall conduct an "informal inquiry."  Nothing contained in either Georgia Tech's or the Board of Regents' rules required Georgia Tech to disclose to Petitioner what information was reviewed by that Committee in connection with its informal inquiry.  Petitioner has failed to show why the length of time spent by this Committee in conducting its informal inquiry fails to comport with due process.  However, even assuming that Petitioner could establish any deficiencies with regard to either step one or step two, so long as Respondents can show that the hearing Petitioner received with the Faculty Hearing Committee provided him with a full and fair opportunity to present his case, any alleged deficiency with regard to either of these steps was remedied through the hearing process.  *Edmonds v. Bd. of Regents*, 302 Ga. App. 1, 11 (2009) ("[p]rocedural due process may be satisfied by a subsequent remedial proceeding where notice and an opportunity to be heard are afforded.").

2.  *Respondents Complied With The Witness
    Disclosure Requirements Set Forth In The
    Board Of Regents Policy Manual And the
    Georgia Tech Faculty Handbook.*

Petitioner alleges that Georgia Tech "did not provide access to Dr.

Laskar or his counsel to interview Georgia Tech employees."  Petition, ¶ 82.

Section 5.10.4 of the Georgia Tech Faculty Handbook provides:  "The

Faculty member and the administration shall be afforded a reasonable

opportunity to obtain necessary witnesses and documentary or other

evidence."  Nothing in Section 5.10.4 or any other provision of the Georgia

Tech Faculty Handbook or the Board of Regents Policy Manual required

Respondents to make any witnesses available to Petitioner's attorney either

to interview prior to the hearing or to make them available to appear as

witnesses at the hearing.  Every member of the Georgia Tech's faculty and

staff can be located by searching Georgia Tech's website.  Petitioner has not

alleged, nor is there any basis for alleging, that any individual at Georgia

Tech interfered with Petitioner's ability to obtain testimony from any

witness.  The Due Process Clause does not require Respondents to make

witnesses available to Petitioner either prior to or on the date of a hearing.

3.   *Georgia Tech Produced All Responsive Documents, Including Any Exculpatory Information.*

Petitioner alleges that Georgia Tech prevented Petitioner from obtaining access to material documents.  In addition to the documents that Georgia Tech produced to Petitioner in preparation for the hearing before the Faculty Hearing Committee, Georgia Tech produced several thousand pages of documents to Petitioner's attorney in response to numerous Open Records Act requests.

Petitioner's attorneys filed an Open Records Act lawsuit against the Board of Regents on October 4, 2010.  *Gilbert v. Board of Regents, et al.,* Civil Action File No. 2010-CV-191728.  Contrary to the allegation in the Petition, the court did not rule that Georgia Tech had violated the Open Records Act.  *See* Petition, ¶ 74.  On August 9, 2011, the court ordered Georgia Tech to produce approximately 515,000 emails to Petitioner.  However, the court did not hold that Georgia Tech had violated the Open Records Act.  The court held that: "because the Court has found that Respondents acted with substantial justification in responding to Petitioner's ORA requests, the Petition for Attorneys' Fees and Litigation Costs is DENIED."  Respondents' Exhibit F.  Georgia Tech produced the approximately 515,000 emails to Petitioner's attorneys on August 12, 2011.

Respondent's Exhibit G.  Petitioner has not alleged that any of the documents produced by Georgia Tech are exculpatory or would have changed the outcome of the hearing.

      4.    *Petitioner Was Provided Sufficient Time To Present His Case.*

Petitioner complains that the hearing was flawed because presentations were limited "to five (5) hours per side."  Petition, ¶ 60.  Although the Committee requested that each side limit its presentation to five hours per side, that time limitation did not include time allotted for the Committee members to ask questions.  Respondents' Exhibit H.  In fact, the hearing was conducted from 9 a.m. to 1 p.m. over four days.  Petition, ¶ 60.  In order to save time, the parties submitted written opening statements prior to the commencement of the hearing.  *See* Respondents' Exhibit H. Petitioner was given a full and fair opportunity to present his case before the Faculty Hearing Committee made its report and recommendation.

      5.    *Petitioner Failed To Allege Sufficient Facts To Support A Claim of Pre-Hearing Publicity.*

Petitioner alleges that Respondents violated Section 5.10.4 of the Georgia Tech Handbook, which provides that "public statements and publicity about the case by either the Faculty member or Administrative Officers should be avoided until the proceedings have been completed."

16

However, Petitioner failed to allege any facts whatsoever that support his allegation that any individual at Georgia Tech gave any public statements in violation of this policy or that Petitioner was in any way harmed by any such alleged statements. Such conclusory allegations should be dismissed. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

> 6. *Review By The Board Of Regents.*

Petitioner alleges that the Board of Regents' review was "limited and superficial" and that the fact that Petitioner's counsel was not permitted to be present at the time of the review to present oral argument constitutes a denial of due process. Petitioner alleges that the Board of Regents spent approximately fifteen (15) minutes during its August 2011 meeting considering Petitioner's appeal. Petition, ¶ 78. This does not include the time prior to the meeting during which Board members reviewed the Faculty Hearing Committee decision and the appeal filed by Petitioner. Even assuming Petitioner's assertion that the Board of Regents spent fifteen minutes at its meeting addressing Petitioner's appeal is accurate, that is a reasonable amount of time, in light of the other levels of hearing and review

provided Petitioner pursuant to the Board of Regents Policy Manual and Georgia Tech Faculty Manual.

> C.   *Dr. Peterson Is Immune From Suit Under the Georgia Tort Claims Act.*

Petitioner has named Dr. Peterson, Georgia Tech's president, in his official capacity, as a Respondent in this action.  Dr. Peterson is not subject to suit for decisions made within his official capacity as President of the university.  *Edmunds v. Bd. of Regents*, 302 Ga. App. at 8.  *See also* O.C.G.A. § 50-21-24(2) ("The state shall have no liability for losses resulting from: . . . The exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved is abused.").  Petitioner stated no factual or legal basis upon which Dr. Peterson can be held liable for his actions. Therefore, the Petition as to Dr. Peterson is subject to dismissal as a matter of law.

## CONCLUSION

Based on the foregoing argument and citation of authority, Respondents respectfully submit that the Petition for Judicial Review should be dismissed in its entirety with all costs cast against the Petitioner.

Respectfully submitted,

SAMUEL S. OLENS        551540
Attorney General

DENNIS R. DUNN        234098
Deputy Attorney General

STEFAN RITTER        606950
Senior Assistant Attorney General

_____
JULIA B. ANDERSON        017560
Senior Assistant Attorney General

**Please serve:**

JULIA B. ANDERSON
Senior Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia  30334-1300
(404) 463-3630 (telephone)
(404) 657-9932 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the within and foregoing

**BRIEF IN SUPPORT OF MOTION TO DISMISS PETITION FOR**

**WRIT OF CERTIORARI OR IN THE ALTERNATIVE PETITION**

**FOR WRIT OF MANDAMUS** by depositing a copy of the same to be

delivered via United States Mail, addressed as follows:

> Craig M. Frankel
> Robert P. Marcovitch
> LeAnne M. Gilbert
> Gaslowitz Frankel, LLC
> 4500 SunTrust Plaza
> 303 Peachtree Street, N.E.
> Atlanta, GA  30308

This 13th day of October 2011.


JULIA B. ANDERSON
Senior Assistant Attorney General