IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOY LASKAR
PH.D.,

    Plaintiff,

      v.

G.P. "BUD" PETERSON
individually and in his official capacity
as President of the Georgia Institute of
Technology, a Unit of the University
System of Georgia, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:13-CV-1609-TWT

OPINION AND ORDER

This is a lawsuit in which the Plaintiff claims that the Defendants violated his

due process rights when they fired him from his tenured professorship at the Georgia

Institute of Technology. It is before the Court on the Defendants' Motion to Dismiss

[Doc. 7]. For the reasons set forth below, the Defendants' Motion to Dismiss [Doc.

7] is GRANTED.

I. Background

The Plaintiff Dr. Joy Laskar--an electrical engineer specializing in

communication technology--was a tenured professor at the Georgia Institute of

T:\ORDERS\13\Laskar\mtdtwt.wpd

Technology. (Compl. ¶¶ 32, 40.) He also founded and was the Director of the Georgia Electronic Design Center at Georgia Tech. (Compl. ¶ 41.) Each year, the Plaintiff would enter into a contract with Georgia Tech detailing the terms of his employment. (Compl. ¶ 47.) This contract was expressly made subject to the "statutes and regulations of this institution and to the Bylaws and Policies of the Board of Regents." (Compl. ¶ 48.)

On May 17, 2010, Georgia Tech President G.P. Peterson sent the Plaintiff a letter informing him that, effective immediately, he was to be suspended without pay.[1] (Compl. ¶ 59.) Peterson explained: "In reviewing the recent cost overruns within the Georgia Electronic Design Center (GEDC), the Institute's Department of Internal Auditing discovered what they believe to be substantial evidence of malfeasance on your part including the misappropriation of Institute resources for the benefit of a company, Sayana Wireless, LLC, of which you are part owner." (Compl. ¶ 58.)

On June 15, 2010, Dr. Gary May--Chair of the School of Electrical and Computer Engineering at Georgia Tech--sent the Plaintiff a letter notifying him that Georgia Tech intended to initiate dismissal proceedings against him. (Compl. ¶ 63.) The bylaws and policies of the Board of Regents, as well as the statutes and

---

[1]The Plaintiff filed suit arguing that Georgia Tech could not suspend him without pay. (Compl. ¶¶ 60-61.) The case was settled and the Plaintiff continued to receive his salary during the temporary suspension. (Compl. ¶ 62.)

regulations of Georgia Tech, provide for a pre-termination procedure for tenured faculty members, which includes:

> (a) [D]iscussion between the faculty member and appropriate administrative officers looking toward a mutual settlement;
>
> (b) [I]nformal inquiry by a Faculty Status and Grievance Committee, which is authorized to recommend dismissal to the President; and
>
> (c) [A] letter of warning to the affected faculty member indicating that (i) he is about to be terminated; (ii) that he can obtain a formal statement of the charges against him; and (iii) that he can request a formal hearing on the charges before a Faculty Hearing Committee.

(Compl. ¶ 56.) In satisfaction of the first requirement, Dr. May informed the Plaintiff that he could meet with an administrative officer and seek a mutual settlement. (Compl. ¶ 64.) On June 24, 2010, the Plaintiff met with Dr. Gary Schuster. (Compl. ¶ 65.) During the meeting, Dr. Schuster made clear he would only accept a settlement that included the Plaintiff's resignation. (Compl. ¶ 67.)

On July 1, 2010, Dr. May sent the Plaintiff a letter informing him that his case had been referred to the Faculty Status and Grievance Committee ("FSG Committee"). (Compl. ¶ 71.) Plaintiff's counsel asked Georgia Tech representatives what information was given to the FSG Committee, and what type of informal inquiry the FSG Committee conducted. (Compl. ¶ 72.) No information was provided in response to this request. (Compl. ¶ 73.)

On July 9, 2010, Peterson sent the Plaintiff a letter indicating that the FSG Committee voted in favor of initiating dismissal proceedings, and that he was entitled to a statement of charges and a formal hearing. (Compl. ¶ 74.) The Plaintiff requested both. (Compl. ¶ 75.) On October 6, 2010, Dr. May sent the Plaintiff a detailed written statement of the charges against him:

> Charge 1: You are charged with willful violations of the policies of the Board of Regents and Georg[i]a Tech relating to professional incompetency or neglect of duty by using, or causing to be used, Institute monies and other Institute resources to benefit your private, for-profit company, Sayana Wireless LLC ("Sayana").

> Charge 2: You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by altering GEDC membership agreements.

> Charge 3: You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to false swearing with respect to official documents filed with the Institute by failing to disclose the true nature of your ownership interest in Sayana.

> Charge 4: You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech students and other resources from certain research contracts.

> Charge 5: You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech resources to benefit Sayana.

(Compl. ¶ 78.)[2]  Prior to the hearing, Plaintiff's counsel made two requests to Georgia Tech. First, they asked Georgia Tech to help the Plaintiff coordinate interviews with potential witnesses and to help arrange for them to testify at the hearing. (Compl. ¶¶ 80, 83.) Georgia Tech refused. (Compl. ¶¶ 81, 84.) Second, Plaintiff's counsel asked Georgia Tech to produce all relevant documents. (Compl. ¶ 80.) Georgia Tech said that it had already produced the relevant documents in response to the Plaintiff's requests under the Georgia Open Records Act. (Compl. ¶ 82.) Georgia Tech, however, withheld a number of documents, and the Plaintiff filed a separate suit to compel the production of those documents. (Compl. ¶ 82.)

Five months after the Plaintiff received a written statement of the charges, the hearing commenced before the Hearing Committee. (Compl. ¶ 79.) There is no allegation that the Plaintiff requested a postponement of the hearing until all of his Open Records Act requests had been ruled upon.  The parties were limited to five hours each for their presentations. (Compl. ¶ 85.) No Georgia Tech employees agreed to testify for the Plaintiff. (Compl. ¶ 86.) On May 7, 2011, the Hearing Committee sent Peterson its findings and recommendation. (Compl. ¶ 87.) It found that the evidence established three out of the five charges, and it unanimously recommended

---

[2]For convenience, a copy of the entire letter (Mot. to Dismiss, Ex. B-4) is reproduced as Appendix A to this Opinion and Order.

that Peterson dismiss the Plaintiff from his position at Georgia Tech. (Compl. ¶¶ 87-88.)[3]

On May 14, 2011, Peterson wrote a letter to the Plaintiff informing the Plaintiff that he had reviewed the recommendation from the Hearing Committee and decided to revoke the Plaintiff's tenure and terminate the Plaintiff's employment. (Compl. ¶ 90.) On June 3, 2011, the Plaintiff appealed Peterson's decision to the Board of Regents. (Compl. ¶ 91.) On August 8, 2011, the Vice Chancellor of Legal Affairs for the Board of Regents, J. Burns Newsome, informed the Plaintiff that his appeal had been presented to the Board of Regents and that it had decided to uphold Peterson's decision. (Compl. ¶ 92.) The Plaintiff was not permitted to attend the meeting where it considered his appeal. (Compl. ¶ 94.)

On September 9, 2011, the Plaintiff filed a petition for a writ of certiorari, or in the alternative for a writ of mandamus, with the Superior Court of Fulton County. (Compl. ¶ 98.) He sought review of the Board of Regents' decision. (Compl. ¶ 98.) On December 21, 2011, the Superior Court dismissed the petition. (Compl. ¶ 100.) It concluded that it lacked jurisdiction to review the termination process. (Mot. to Dismiss, Ex. E.) The Plaintiff filed an application for discretionary appeal with the

---

[3]For convenience, a copy of the letter and report of the committee (Mot. to Dismiss, Ex. B-5) is reproduced as Appendix B to this Opinion and Order.

Georgia Court of Appeals which was granted. (Compl. ¶¶ 101-102.) The Court of Appeals concluded that the Plaintiff was not entitled to certiorari review of the termination decision because the termination proceedings were administrative, not quasi-judicial. (Compl. ¶ 105.) The Plaintiff then brought this action.

The Plaintiff asserts a procedural due process claim under section 1983. He argues that he had a protected property interest in his tenured position, and that the procedure that preceded his termination did not satisfy the requirements of the Due Process Clause of the Fourteenth Amendment. The Defendants include the President of Georgia Tech, G.P. "Bud" Peterson (in his individual and official capacity), the Chancellor of the Board of Regents of the University System of Georgia, Hank Huckaby (in his official capacity), and the individual members of the Board of Regents of the University System of Georgia (in their individual and official capacities).

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).  A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely

"remote and unlikely." <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 556 (2007).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.  <u>See</u> <u>Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.</u>, 711 F.2d 989, 994-95 (11th Cir. 1983); <u>see</u> <u>also</u> <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").  Generally, notice pleading is all that is required for a valid complaint.  <u>See</u> <u>Lombard's, Inc. v. Prince Mfg., Inc.</u>, 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).  Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007).

"[T]he analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto." <u>Brooks v. Blue Cross & Blue Shield</u>, 116 F.3d 1364, 1368 (11th Cir. 1997). However, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." <u>Id.</u> at 1369.  The exhibits attached to the Defendants' Motion to Dismiss

qualify for this consideration.  They are central to the Plaintiff's claims and are not in dispute.

### III. <u>Discussion</u>

A.     <u>Section 1983</u>

"A § 1983 action may be brought for a violation of procedural due process." <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990). "The protections of the Due Process Clause apply to government deprivation of those [benefits] of government employment in which the employee has a constitutionally protected 'property' interest." <u>Gilbert v. Homar</u>, 520 U.S. 924, 928 (1997). "[A] public college professor dismissed from an office held under tenure provisions . . . [has an interest] in continued employment that [is] safeguarded by due process." <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 576-77 (1972).

"In this circuit, a federal court reviewing a decision of a public educational institution to discharge an employee employs a two-tier level of inquiry." <u>Martin v. Guillot</u>, 875 F.2d 839, 844 (11th Cir. 1989). "We examine [1] whether the procedures followed by school authorities comported with due process requirements, and if so, [2] whether the action taken is supported by substantial evidence." <u>Id.</u>; <u>see also</u> <u>McKinney v. Pate</u>, 20 F.3d 1550, 1558 n.13 (11th Cir. 1994) (referencing the two-tier inquiry with approval and concluding that the "substantial evidence" component was

an "appropriate, essentially procedural, review of the sufficiency of the evidence.").
The Plaintiff does not allege that the Hearing Committee's findings were not supported
by substantial evidence. Consequently, the Court need only look to the first prong of
the test.   Initially, the Defendants make two arguments. First, the Defendants claim
that there was no procedural due process violation because there are state remedies for
challenging any deficiencies in Georgia Tech's termination procedure. Second, the
Defendants claim that the termination procedure nonetheless satisfied procedural due
process requirements. Each will be discussed.

The Defendants argue the Plaintiff could have challenged Georgia Tech's
termination procedure before a Georgia court and remedied the alleged deficiencies.
With procedural due process, "[t]he constitutional violation actionable under § 1983
is not complete when the deprivation occurs; it is not complete unless and until the
State fails to provide due process." Zinermon v. Burch, 494 U.S. 113, 126 (1990).
Thus, when assessing a procedural due process claim the Court looks not only to the
procedure employed in depriving the plaintiff of a property interest, but also to the
available state remedies for challenging that procedure. See Horton v. Board of Cnty.
Comm'rs of Flagler Cnty., 202 F.3d 1297, 1300 (11th Cir. 2000) ("[T]he process a
state provides is not only that employed by the board, agency, or other governmental
entity whose action is in question, but also includes the remedial process state courts

would provide if asked."); Zinermon, 494 U.S. at 125-26 ("[In a] § 1983 action . . .

brought for a violation of procedural due process . . . [the] inquiry would examine the

procedural safeguards built into the . . . administrative procedure of effecting the

deprivation, and any remedies for erroneous deprivations provided by statute or tort

law."). There is a due process violation only if available state remedies fail to bring

the underlying procedure into compliance with procedural due process requirements.[4]

See Foxy Lady, Inc. v. City of Atlanta, Ga., 347 F.3d 1232, 1238 (11th Cir. 2003)

("[E]ven if a procedural deprivation exists during an administrative hearing, such a

claim will not be cognizable under § 1983 if the state provides a means by which to

remedy the alleged deprivation."); Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir.

2000) ("It is the state's failure to provide adequate procedures to remedy the otherwise

procedurally flawed deprivation of a protected interest that gives rise to a federal

procedural due process claim.").

---

[4]This has also been referred to as the "McKinney rule." In that case, the Eleventh Circuit stated:

> [E]ven if [the plaintiff] suffered a procedural deprivation at . . . his termination hearing, he has not suffered a violation of his procedural due process rights unless and until the State . . . refuses to make available a means to remedy the deprivation. . . .[O]nly the state's refusal to provide a means to correct any error . . . would engender a procedural due process violation.

McKinney, 20 F.3d at 1563.

The Defendants argue that there were two state remedies available to the Plaintiff: the writ of certiorari and the writ of mandamus. First, "[u]nder Georgia law, certiorari only lies to correct the errors committed 'by any inferior judicatory or any person exercising judicial powers.'" Cotton, 216 F.3d at 1332 (citing O.C.G.A. § 5-4-1(a)). "To determine if certiorari lies we must decide whether [the Defendants'] acts were judicial or quasi-judicial or whether they were administrative or legislative." Id. Here, the Plaintiff filed a petition for certiorari with the Superior Court of Fulton County. This petition was dismissed for lack of jurisdiction. The Georgia Court of Appeals affirmed the dismissal after finding that the termination procedure was not judicial or quasi-judicial. See Laskar v. Board of Regents of University System of Georgia, 320 Ga. App. 414, 419 (2013) ("We conclude . . . that despite the procedures for notice and a hearing before the Hearing Committee, the decision to dismiss Laskar was essentially an administrative one."). Consequently, this remedy was not available to the Plaintiff.

However, "[j]ust because under Georgia law certiorari will not lie does not mean that there were no adequate state procedures available to [the Plaintiff]." Cotton, 216 F.3d at 1332. Although certiorari requires a quasi-judicial proceeding, mandamus does not: "*All official duties* should be faithfully performed, and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper

performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights."[5] O.C.G.A. § 9-6-20 (emphasis added); see also Cotton, 216 F.3d at 1332 ("Under Georgia law, when no other specific legal remedy is available and a party has a clear legal right to have a certain act performed, a party may seek mandamus."). Generally, mandamus is considered an adequate state remedy, thus defeating a procedural due process claim. See Cotton, 216 F.3d at 1333 ("Because we believe that the writ of mandamus would be available under state law to Plaintiff, and because we believe that mandamus would be an adequate remedy to ensure that Plaintiff was not deprived of his due process rights . . . we conclude that . . . Plaintiff has failed to state a claim for a procedural due process violation."); Cochran v. Collins, 253 F. Supp. 2d 1295, 1305 (N.D. Ga. 2003) ("[A writ of mandamus] can be used to compel a . . . governmental board to hold a hearing as provided by law." ).

Here, the Plaintiff alleges that his petition included a mandamus request. However, the Superior Court did not expressly address the mandamus request and it is unclear whether the jurisdictional holding was intended to apply to it. (Mot. to Dismiss, Ex. E.) It is equally unclear whether the Plaintiff pursued it on appeal. The

---

[5]In Cotton, the Court of Appeals found that although the termination proceedings were not judicial or quasi-judicial, the plaintiff could have sought a writ of mandamus. See Cotton, 216 F.3d at 1332.

Georgia Court of Appeals' opinion suggests that the Plaintiff only sought review for his certiorari petition: "Laskar . . . appeals the trial court's order dismissing his petition for writ of certiorari for lack of jurisdiction." <u>Laskar</u>, 320 Ga. App. at 414. Nonetheless, the Court must construe the allegations in the Plaintiff's favor. It is plausible that both the Superior Court and the Georgia Court of Appeals summarily dismissed his mandamus request without addressing the merits.

The Defendants also argue that the Georgia Tech termination procedure satisfied due process requirements. The minimum procedural due process requirements when "a teacher who is to be terminated for cause opposes his termination" are: "(1) notice of the reasons for dismissal; (2) notice of the names of adverse witnesses and the nature of their testimony; (3) a meaningful opportunity to be heard; and (4) the right to be heard by a tribunal which possesses some academic expertise and an apparent impartiality toward the charges leveled against the teacher."[6]

---

[6]The Defendants argue that this four-part requirement does not apply because it is a "statutory standard [O.C.G.A. § 20-2-940] that applies to hearings for primary and secondary school teachers." (Defs.' Reply in Supp. of Mot. to Dismiss, at 9.)  This reflects a  misunderstanding of  <u>Holley</u>. In that case, the Court of Appeals was not citing to O.C.G.A. § 20-2-940 as authority supporting the standard. The Court of Appeals was determining whether O.C.G.A. § 20-2-940 *met* this standard. <u>See</u> <u>Holley</u>, 755 F.2d at 1497 ("The Fair Dismissal Act of Georgia . . . meets . . . the due process standard."). Additionally, the Court of Appeals has previously applied this four-part requirement in the context of higher education. <u>See</u> <u>Martin v. Guillot</u>, 875 F.2d 839 (1989).

Holley v. Seminole Cnty. Sch. Dist., 755 F.2d 1492, 1497 (11th Cir. 1985). However, "the pretermination hearing . . . need not be elaborate." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985) (internal quotation marks omitted). "[S]omething less than a full evidentiary hearing is sufficient prior to adverse administrative action." Id. (internal quotation marks omitted). "The essential requirements of due process . . . are notice and an opportunity to respond . . .   To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546. It is clear that all of the procedural due process protections afforded to a defendant in a criminal case are not required in this context.

Here, the Plaintiff received prior notice of the charges against him. (Compl. ¶¶ 58, 78.) He was then granted a hearing before a panel of five faculty members. (Compl. ¶¶ 75, 79; Mot. to Dismiss, Ex. B-2.) The Plaintiff does not allege that the panel lacked academic expertise, or that it was biased against him.[7] During the hearing, the Plaintiff was represented by counsel. He was allowed to (1) present evidence, (2) call any witnesses that agreed to testify for him, and (3) cross-examine

---

[7]The Board of Regents' termination procedure guidelines state that "[a] member [of the Hearing Committee] should remove himself/herself from the case, either at the request of a party or on his/her own initiative if he/she deems himself/herself disqualified for bias or interest." (Mot. to Dismiss, Ex. B-2.)

opposing witnesses. (Mot. to Dismiss, Ex. B-2.) The Plaintiff does not allege that Georgia Tech refused to give notice of the witnesses who would be testifying at the hearing.[8]

The Hearing Committee heard approximately twelve hours of testimony and a large number of documents presented by both the Plaintiff and Georgia Tech. (App. B at 1.) "The members have deliberated in committee for approximately eight hours, and have spent uncounted hours reviewing exhibits, court reporter transcripts and their own notes." (Id.) The Hearing Committee found that three of the five charges were proven in whole or in part. It found that two of the charges were not proven. (Id. at 1-2.) The Hearing Committee unanimously recommended dismissal of the Plaintiff. Its findings were reviewed by Peterson. After Peterson concurred with the findings and terminated the Plaintiff's employment, the Plaintiff was allowed to appeal to the Board of Regents. It affirmed Peterson's decision to terminate the Plaintiff. The Plaintiff argues that this process fell short of the procedural due process requirements.

The Plaintiff first argues that the Georgia Court of Appeals' conclusion that the termination procedure was not "quasi-judicial" shows that, as a matter of law, his due

---

[8]The Board of Regents' termination procedure guidelines require that, upon request, "the faculty member . . . be advised of the names of witnesses to be used against him or her together with the nature of their expected testimony." (Mot. to Dismiss, Ex. B-2.)

process rights were violated. This argument assumes that due process requires a "quasi-judicial" procedure. This assumption is incorrect. See Jaeger v. Freeman, 410 F.2d 528, 531 (5th Cir. 1969) ("[D]ue process does not in every instance require the Government to afford a trial-type hearing to an employee before discharging him."); Harrison v. Wille, 132 F.3d 679, 684 (11th Cir. 1998) ("Before termination, a full evidentiary hearing is not required. . . . Plaintiff need only be given an opportunity to present his side of the story.");  McKinney v. Pate, 20 F.3d 1550, 1561(11th Cir. 1994) ("The employee is entitled to 'some kind' of pre-termination hearing . . . [t]hat hearing is not a mini-trial . . ..").

Second, the Plaintiff argues that because the Georgia Tech President had the final say, the hearing before the committee was not meaningful. But there have been many cases where a termination procedure was found to comply with due process requirements even though due process hearing committee did not make the final decision.  See  Martin v. Guillot, 875 F.2d 839, 844 (11th Cir. 1989) ("[The plaintiff] received a hearing before a due process committee which recommended that his employment be terminated. After a review, the president accepted the committee's recommendation. . . .Such procedures . . . meet the minimum constitutional standards for procedural due process."); Bowling v. Scott, 587 F.2d 229, 230-31 (5th Cir. 1979) ("After considering the committee's report . . . the University official assigned the

responsibility of making the final institutional decision with respect to [the plaintiff's] future employment, accepted the recommendation . . . and informed [the plaintiff] by letter . . . that his employment would be terminated."). Quoting from the dissenting opinion in <u>Arnett v. Kennedy</u>, the Plaintiff argues that "for the hearing to be meaningful, the hearing officer must be independent and unbiased and *his decision be entitled to some weight*." <u>Arnett v. Kennedy</u>, 416 U.S. 134, 216 (1974) (Marshall, J., dissenting) (emphasis added). This is just an incorrect statement of the law in this context.  In any event, the Hearing Committee's report was given weight. It was submitted to the President for review prior to a final decision. In the event that the President disagrees with the Hearing Committee, he must "state his/her reasons in writing to the Committee for response before rendering his/her final decision."[9] (Mot. to Dismiss, Ex. B-2.)  Peterson made no statement disagreeing with the Hearing Committee's report.  The Plaintiff has no authority for support of his argument that either Peterson or the Board of Regents was required to hold an evidentiary hearing before acting upon the recommendation of the Hearing Committee that he be dismissed.  Imposing such a requirement would have a paralyzing effect upon

---

[9]In this case the Hearing Committee recommended the Plaintiff's dismissal, thus it would have made no difference if the President was bound by its determination.

institutions of higher learning such as Georgia Tech and the University System of Georgia.

Third, the Plaintiff argues that Georgia Tech should have compelled witnesses to appear on his behalf. But procedural due process does not include the right to subpoena witnesses in an administrative hearing. See Foxy Lady, 347 F.3d at 1237 ("[W]e . . . now hold expressly that procedural due process . . . does not require an absolute or independent right to subpoena witnesses in administrative hearings."). However, given that due process requirements may vary based on context, it is possible that in a particular case some opportunity to compel witnesses may be necessary. See Morrissey v. Brewer, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). None of the Plaintiff's allegations support a conclusion that this is such a case. "[O]ther than stating that he would have liked to call [the witnesses] to testify on his behalf, Plaintiff never explains how their testimony would have been relevant to the . . . proceeding, or how he was prejudiced without having them testify." Hames v. City of Miami, 479 F. Supp. 2d 1276, 1289-90 (S.D. Fla. 2007). Here, the Plaintiff was able to submit his own evidence, cross-examine Georgia Tech's witnesses, and speak on his own behalf. See Foxy Lady, 347 F.3d at 1238 (the ability to

cross-examine witnesses and present other forms of evidence mitigated any disadvantage caused by the lack of subpoena power.).

Fourth, the Plaintiff argues that Georgia Tech impermissibly withheld material documents from him. "The tenured public employee is entitled to . . . an explanation of the employer's evidence." Loudermill, 470 U.S. at 546; see also Brock v. Roadway Exp., Inc., 481 U.S. 252, 264-65 (1987) ("[T]he constitutional requirement of a meaningful opportunity to respond before a . . . deprivation may take effect entails . . . the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence."). A party that is "not informed of the relevant evidence supporting" the charges may be "deprived of an opportunity to prepare a meaningful response." See Brock, 481 U.S. at 268.

Prior to the hearing, Georgia Tech provided records in response to 72 separate Open Records Act requests. (Mot. to Dismiss, Ex. B-6.)  It provided to the Plaintiff the documents that it relied upon in seeking the Plaintiff's termination.  On August 8, 2011, the Superior Court of Fulton County ordered Georgia Tech to produce an additional 515,000 e-mails in response to a disputed Open Records Act request.  This was after the faculty hearing.  But the Plaintiff had all of these records for more than a year before filing this lawsuit.  His only description of the documents in his Complaint is that they were "potentially exculpatory and explanatory documents."

(Compl. ¶ 138.)  The Plaintiff has failed to allege any facts that even suggest that the outcome of the hearing would have been any different if the documents had been disclosed earlier.  He makes no such argument in his response to the Defendants' Motion to Dismiss.  Indeed, he does not deny that there was substantial evidence in support of the Hearing Committee's report and recommendation.  Accordingly, he has failed to state a plausible claim for relief with respect to this procedural due process claim.

        B.     <u>Qualified Immunity</u>

The Defendants may not be liable for civil damages if they are entitled to qualified immunity. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1232 (11th Cir. 2004) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." <u>Id.</u> (internal quotation marks omitted). The Plaintiff must show that the alleged constitutional violation was "clearly established." <u>See</u> <u>Pearson</u>, 555 U.S. at 232. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

Anderson v. Creighton, 483 U.S. 635, 640 (1987). It is not enough to show that the general right to due process was clearly established. The Plaintiff must show that it was clearly established that the Defendants' conduct violated his procedural due process rights. See id. at 639 ("[T]he right to due process of law is quite clearly established by the Due Process Clause . . . [b]ut if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*."). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 827 n.4 (11th Cir. 1997). "Qualified immunity does not shield against equitable claims." Burrell v. Board of Trustees of Ga. Military Coll., 970 F.2d 785, 788 (11th Cir. 1992). Thus, qualified immunity may only preclude the Plaintiff from recovering damages.

Here, the law was clearly established that a tenured professor has a property interest in his continued employment. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576-77 (1972). However, the Plaintiff has not shown that Georgia Tech and the Board of Regents clearly violated the Plaintiff's due process rights by

following the hearing and dismissal process set forth in the Board of Regents Policy Manual and the Georgia Tech Faculty Handbook.

      C.    <u>Rooker-Feldman Doctrine and Res Judicata</u>

The Defendants argue that the Court lacks jurisdiction over the Plaintiff's claim under the Rooker-Feldman doctrine. "The Rooker-Feldman doctrine is a narrow doctrine that only applies to an attempt to appeal a state court judgment." <u>Vasquez v. YII Shipping Co., Ltd.</u>, 692 F.3d 1192, 1195 (11th Cir. 2012). It is "confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon-Mobile Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. 280, 284 (2005). "The doctrine applies both to federal claims raised in the state court and to those 'inextricably intertwined' with the state court's judgment." <u>Casale v. Tillman</u>, 558 F.3d 1258, 1260 (11th Cir. 2009). "A claim is inextricably intertwined if it would effectively nullify the state court judgment . . . or it succeeds only to the extent that the state court wrongly decided the issues." <u>Id.</u> (internal quotation marks omitted). Here, the Georgia Court of Appeals dismissed the petition for lack of subject matter jurisdiction. It did not resolve the Plaintiff's due process argument. Thus, "[the Plaintiff] is not asking a federal court to review and

reject a judgment of the state court because the [Georgia] court never addressed the issue [the Plaintiff] asks us to resolve." <u>Vasquez</u>, 692 F.3d at 1196.

The Defendants also argue that the Plaintiff's claims are barred by res judicata. "When deciding whether claims are barred by res judicata, federal courts apply the law of the state in which they sit." <u>Starship Enterprises of Atlanta, Inc. v. Coweta Cnty., Ga.</u>, 708 F.3d 1243, 1252-53 (11th Cir. 2013). Under Georgia law, "[t]hree prerequisites must be met before res judicata will apply: (1) identity of the cause of action; (2) identity of the parties or their privies; and (3) previous adjudication on the merits by a court of competent jurisdiction." <u>Id.</u> at 1253-54 (internal quotation marks omitted). Here, res judicata does not preclude the Plaintiff's claim. First, the Georgia Court of Appeals dismissed the Plaintiff's petition for lack of subject matter jurisdiction. "[T]he dismissal of a complaint for lack of jurisdiction does not adjudicate the merit so as to make the case res judicata on the substance of the asserted claim." <u>Boone v. Kurtz</u>, 617 F.2d 435, 436 (5th Cir. 1980); <u>see also</u> <u>Davila v. Delta Air Lines, Inc.</u>, 326 F.3d 1183, 1188 (11th Cir. 2003) (Dismissal "for lack of subject matter jurisdiction . . . plainly is not an adjudication on the merits that would give rise to a viable res judicata defense."). The Defendants respond by pointing out that res judicata applies to claims that "might have been put in issue" in a previous suit. (Mot. to Dismiss, at 13.) This is not responsive. In order for res judicata to preclude a claim

that could have been brought in a previous suit, the res judicata elements must be satisfied. One of the elements is that there be an adjudication on the merits. Second, there is no identity between the causes of action. "For th[e] doctrine to act as a bar, the cause of action in each suit must be identical." <u>Morrison v. Morrison</u>, 284 Ga. 112, 115 (2008) (internal quotation marks omitted). "A cause of action has been defined as being the *entire* set of facts which give rise to an enforceable claim." <u>Id.</u> at 116. "Where . . . some of the operative facts necessary to the causes of action are different in the two cases, the later suit is not upon the same cause as the former . . . although the subject matter may be the same." <u>Id.</u> (internal quotation marks omitted). Here, the section 1983 due process claim depends on additional facts not relevant in the state proceeding: the facts regarding the state proceeding itself. A procedural due process claim requires a showing that available state remedies were inadequate. Thus, the Plaintiff cannot be required to bring a section 1983 claim while simultaneously pursuing those state remedies.

      D.     <u>Section 1985(3)</u>

      The Complaint states that this action also arises under section 1985(3). (Compl. ¶ 26.) "In order to establish a § 1985(3) conspiracy claim, [the Plaintiff] must show an agreement between 'two or more persons' to deprive him of his civil rights." <u>Dickerson v. Alachua Cnty. Comm'n</u>, 200 F.3d 761, 767 (11th Cir. 2000). Here,

although the Complaint references section 1985(3) twice, there is no allegation of a conspiracy or any facts supporting such a finding. The Plaintiff also does not reference this claim in his response. Accordingly, this claim should be dismissed.

IV. <u>Conclusion</u>

For the reasons set forth above, the Court GRANTS the Defendants' Motion to Dismiss [Doc. 7].

SO ORDERED, this 20 day of December, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

Appendix A



### Georgia Tech | College of Engineering

Gary S. May
*Professor and Steve W. Chaddick School Chair*
School of Electrical and Computer Engineering

Dr. Joy Laskar
860 Saints Drive
Marietta, GA  30068

October 6, 2010

Re:  Statement of charges—Joy Laskar, Ph.D.

Dear Dr. Laskar:

As a duly designated representative of the President of the Georgia Institute of Technology ("Georgia Tech" or the "Institute") and Chair of the School of Electrical & Computer Engineering, I am responding to your request for a statement of charges against you.  This letter also contains information concerning the policies and procedures for disciplinary action for the Board of Regents of the University System of Georgia and the Institute.  Pursuant to your request, you will be provided a formal hearing on the charges before the Faculty Hearing Committee.  We propose to schedule that hearing at the earliest opportunity.

<u>Policies and Procedures</u>

The Policies of the Board of Regents of the University System of Georgia (the "Board of Regents Policy") for the removal of faculty members provides that:

> A tenured or non-tenured faculty member may be dismissed before the end of his/her contract term for any of the following reasons, provided that the institution has complied with procedural due process requirements:

> 2.  Professional incompetency, neglect of duty, or default of academic integrity in teaching, in research, or in scholarship.

> 6.  False swearing with respect to official documents filed with the institution.

Board of Regents Policy Manual (the "Manual"), § 8.3.9.1

The Institute's Faculty Handbook (the "Handbook") provides similar procedures for the removal of faculty members.  Specifically, Section 5.10.1 provides that:

> Tenured Faculty members, or nontenured Faculty members before the end of their contract term, may be dismissed for any of the following reasons provided that the

School of Electrical and Computer Engineering
Georgia Institute of Technology
Atlanta, Georgia 30332-0250 U.S.A.
PHONE 404.894.2902  FAX 404.894.4641
www.ece.gatech.edu
*A Unit of the University System of Georgia*     *An Equal Education and Employment Opportunity Institution*



DEFENDANT'S
EXHIBIT
B-4



RESPONDENT
EXHIBIT
D

Institute has complied with procedural due process requirements.

- Professional incompetence, neglect of duty, or default of academic integrity in teaching, research, or scholarship;
- False swearing with respect to official documents filed with the Institute;
- Disruption of any teaching, research, administrative, disciplinary, public service, or other authorized activity.

Finally, the Board of Regents Policy provides that:

> The president of an institution may at any time remove any faculty member or other employee of an institution for cause. Cause shall include willful or intentional violation of the policies of the Board of Regents or the approved statutes of an institution. Further causes or grounds for dismissal are set forth in the tenure regulations of the policies of the Board of Regents and in the approved statutes or bylaws of an institution[.]

Manual, § 8.3.9

The Statement of Charges against you is as follows:

**Charges**

Charge 1:    You are charged with willful violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by using, or causing to be used, Institute monies and other Institute resources to benefit your private, for-profit company, Sayana Wireless LLC ("Sayana").

**Using Institute Monies and Resources to Benefit Sayana**

While employed by Georgia Tech as Director of the Georgia Electronic Design Center ("GEDC"), you founded and retained an ownership interest in Sayana. In your capacity as owner and co-founder of Sayana, you entered into research agreements with certain private companies and ETRI, a research group funded by the South Korean government. Under these research agreements, Sayana was required to import certain electronic chips manufactured by CMP, a French-based manufacturer of specialized electronic components. In your capacity as Director of GEDC, you caused GEDC employees to order electronic chips from CMP in the name of GEDC. Those chips, in turn, were used to satisfy the requirements of contracts between Sayana and ETRI. Georgia Tech ultimately received past due invoices from CMP in the amount of at least $200,000.

In order to pay these invoices, you requested additional funding for GEDC from Mark Allen, then Senior Vice Provost for Research, in the amount of $200,000. When your request was refused, you caused GEDC employees to prepare a document that purported to be a CMP quote in the amount of $50,000 and to submit that quote to Georgia Tech's Accounts Payable as part of the documentation for a payment to CMP. Georgia Tech honored the ostensible invoice and transferred $50,000 to CMP.

Charge 2:     You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by altering GEDC membership agreements.

## Altering GEDC Membership Agreements

In your capacity as Director of GEDC, you caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the Georgia Tech Research Corporation (which would have required the payment of certain overhead expenses to Georgia Tech) to the Georgia Tech Foundation (where the funds were not encumbered by overhead expenses or specific oversight).

Charge 3:     You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to false swearing with respect to official documents filed with the Institute by failing to disclose the true nature of your ownership interest in Sayana.

## False Swearing on the Institute's Conflict of Interest Form

Despite having founded and retained an ownership interest in Sayana, you failed to disclose the true nature of your ownership interest in Sayana. In your 2007 Conflict of Interest disclosure, you indicated that you were an "advisor" to Sayana, spending less than one day a month engaged in Sayana business. In your 2008 Conflict of Interest disclosure, you indicated that you were a "co-founder" of Sayana but spent less than one day a month working for Sayana. In your 2009 Conflict of Interest disclosure, you indicated that you were a "co-founder" of Sayana but spent less than one day a month working for Sayana and played no role in the purchase of the company's goods or services.

Certain documents and email exchanges indicate that you played an active role in the management and direction of Sayana, and that you had signatory authority to enter into contracts on behalf of the company. Documents also demonstrate that you worked substantially in excess of one day per month on Sayana business. These activities also violate section 8.2.15 of the Manual.

Charge 4:     You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech students and other resources from certain research contracts.

## Diverting Institute Resources from Research Contracts

Research contracts between Sayana and ETRI provided that certain individuals would spend all of their working time (i.e., 100% time) in the performance of work required by the contract. Many of the individuals identified in the research contracts between Sayana and its corporate and foreign government partners held positions at Georgia Tech under your supervision, including graduate research assistants, postdoctoral fellows and research engineers. These individuals were supported by Georgia Tech at 100% time, but were diverted from Georgia Tech's projects by their full time assignment to Sayana work.

Charge 4:    You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech resources to benefit Sayana.

<u>Use of Institute Resources to Benefit Sayana</u>

Certain evidence demonstrates that you used, and caused others to use, Institute offices, laboratory space, equipment, and computer and networking resources to conduct research and other business on behalf of Sayana without Georgia Tech authorization.  As required by Georgia Tech policy, you failed to establish a cost center or enter into lease/rental agreements with the Institute.

The witnesses who may testify against you on these charges are as follows:

Mark Allen
Stephen Fleming
Jilda Garton
Edward Gebara
Melissa Hall
Phillip Hurd
Patrick Jenkins
Gary May
Stephane Pinel
Lauren Robb
Gary Schuster
Eric Trevena
Christopher D'Urbano
Kevin Wozniak


Sincerely,

Gary S. May
Professor and Steve W. Chaddick School Chair
School of Electrical & Computer Engineering


C:      R. Bras
        C. Frankel
        P. McKenna
        R. Mick
        G. Parker
        K. Wasch

Appendix B



**Georgia Institute of Technology**

The H. Milton Stewart School
of Industrial & Systems Engineering

May 7, 2011

Dr. Bud Peterson, President
Georgia Institute of Technology
CAMPUS

Dear President Peterson:

This letter summarizes the findings of the dismissal hearing committee in the matter of Professor Joy Laskar. The committee heard approximately twelve hours of testimony and argument, and considered the rather large number of exhibits assembled by both the Institute and Professor Laskar. The members have deliberated in committee for approximately eight hours, and have spent uncounted hours reviewing exhibits, court reporter transcripts and their own notes.

The dismissal hearing committee is a committee of the General Faculty of the Institute, and is guided by chapter 5.10 of the Georgia Tech Faculty Handbook. It is responsible to see that, in the case of the faculty member facing dismissal, the evidence, both for and against, has been weighed carefully to determine whether or not dismissal is warranted.

In the case of Professor Laskar, the Institute has made five specific charges which relate to the Georgia Electronic Design Center (GEDC) and to the company Sayana Wireless. Professor Laskar directed GEDC and in that capacity reported directly to Dr. Mark Allen, Senior Vice Provost for Research. In addition, Professor Laskar, as a Georgia Tech ECE faculty member, reported to the ECE School Chair, Professor Gary May. Finally, Professor Laskar was a founder, co-owner and manager of Sayana.

With regard to each of the five specific charges, our findings are summarized below and explained in greater detail in the attached report.

**Charge 1, GT Claims:** (1) Chips purchased from a French chip fabricator, CMP, by Georgia Tech for GEDC at Laskar's behest were used to satisfy requirements of a contract between Sayana and a Korean entity, ETRI. (2) Laskar caused a forged quote to be prepared, in order to generate a purchase order to CMP, which subsequently led to an invoice that was honored by Accounts Payable.

**Conclusion:** The first part of the charge 1 claim, regarding the chips shipped to ETRI, is proven. The chips shipped to ETRI were purchased by Georgia Tech, and there is no evidence that title to these chips was ever transferred to Sayana. There is some evidence that this may have been a common practice for start-up companies in GEDC under Laskar's leadership.

The second part of charge 1, regarding the falsified quote, is not proven. We find no direct evidence Laskar caused the quote to be fabricated.

**Charge 2, GT Claims:** Laskar caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the GTRC to the GT Foundation.

**Conclusion:** The charge is not proven. If GEDC membership agreements for Education Members were altered from their original form to show a GT Foundation routing and account number, this would have been appropriate given GEDC bylaws and would not have constituted professional incompetence or neglect of duty.

Atlanta, Georgia 30332-0205 U.S.A.
WEB SITE: http://www.isye.gatech.edu

PHONE: 404.894.2300
FAX: 404.894.2301

*A Unit of the University System of Georgia*       *An Equal Education and Employment Opportunity Institution*



RESPONDENT
EXHIBIT
E



DEFENDANT'S
EXHIBIT
B-5

● Page 2                                                           May 6, 2011

However, Laskar's documented attempt to subvert the GT Foundation rules regarding deliverables was, nonetheless, a serious breach of GT policy.

**Charge 3, GT Claims:**  Submitted COI forms for 2007-8-9 fail to disclose the full extent of Laskar's involvement in Sayana.

**Conclusion:**  This charge is proven, the submitted COI forms did not fully disclose the extent of Laskar's participation in Sayana, nor the clear conflicts that were created in the case of ETRI.  However, testimony of May and Allen indicates that each of them knew of Laskar's involvement with Sayana, and neither pursued any concern about potential conflicts.

**Charge 4, GT Claims:**  Individuals under Laskar's supervision who were paid full time by Georgia Tech were diverted from Georgia Tech projects to a full time assignment to Sayana work required to satisfy a contract from ETRI.

**Conclusion:** This charge is not proven, i.e., while it is possible that Institute resources were diverted, it is not proven.  However, it is clear that Sayana received payment for work that actually was performed (and paid for) by Georgia Tech, and that Sayana failed to properly cite the original sources for the data contained in the reports to ETRI.

**Charge 5, GT Claims:**  Sayana was using GT offices, lab space, equipment, and IT resources for its own research and its own business without the GT authorization that would have been granted with a cost center or lease/rental agreement with the Institute.

**Conclusion:**  The charge as written is proven.  There is evidence that other startup companies and members used Georgia Tech resources as well under Laskar's leadership, without raising flags.

**Recommendation:**  These violations are sufficiently egregious to warrant dismissal.  While the climate in GEDC may have encouraged some of these violations, Professor Laskar's leadership position in the GEDC gave him a particular responsibility to set an example and to insure that such violations did not occur.

The committee would welcome an opportunity to discuss its findings and other concerns in person.

Sincerely,

Leon F. McGinnis
Professor, ISyE and Committee Chair

Sean Thomas
Research Technologist II, GTRI-ATAS

Sigrun Andradottir
Professor, ISyE

Linda Viney
Principal Research Engineer, GTRI-ELSYS

Enc:  Joy Laskar Dismissal Hearing Committee Final Report

**Dismissal Hearing for Joy Laskar**
**Hearing Committee Final Report**
**6May2011**

This report summarizes the committee's evaluation of the evidence and conclusions regarding the charges presented. In this report JLxxx refers to an exhibit presented by Laskar, and GTxxx refers to an exhibit presented by the Institute.

**Charge 1:** You are charged with willful violation of the policies of the Board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by using, or causing to be used, Institute monies and other Institute resources to benefit your private, for-profit company, Sayana Wireless LLC ("Sayana").

**GT claim:** Chips purchased from CMP by Georgia Tech for GEDC at Laskar's behest were used to satisfy requirements of a contract between Sayana and ETRI. Further, Georgia Tech ultimately received past due invoices from CMP, and in attempting to convince Georgia Tech to cover these invoices from non-GEDC resources, Laskar caused a forged CMP quote to be prepared, in order to generate a purchase order, which subsequently was honored by Accounts Payable.

**Laskar response:** GTRC is a shareholder and co-owner of Sayana. Georgia Tech benefited from all the CMP chips it paid for. The total value of chips sent to ETRI was less than the total amount Sayana paid for CMP chips. Other faculty start-up companies used Georgia Tech resources in the same manner as Sayana. Laskar did not have any involvement in the creation of the falsified quote.

**In Evidence:** Laskar concedes that chips with total value of $259,500 were shipped to ETRI in 2006-2008 (at JL214). Laskar further concedes that no payments for chip fabrication were made by Sayana prior to 2009 (at JL215).

The sworn statement of Dr. Paul Hessler (at JL351) asserts that it was common practice in GEDC for faculty with start-up companies to use unrestricted Georgia Tech funds to support their research (including support for graduate students), and for the resulting prototypes and building blocks to be made available to potential commercial partners, provided said chips had no resale value.

With respect to the forged quote, Laskar approached Allen for $200K, then $100K, then $50K (GT918, GT924, GT928). Allen made the decision at that point to provide the $50K for the sake of the students (GT90).

Georgia Tech paid $50K for a CMP chip run in July 2007 (GT880, GT891, GT892).
The order was made with no PO number and not encumbered (GT903).
There is evidence that the quote was fabricated (GT934-GT940).
A note on the invoice (GT880) asks Cathy if the invoice was paying for goods or services and mentions that it was hard to tell. The note also asked if it was ok to pay. The invoice was generated on 10 December 2009, but the chip run labeled GT_Jul2007 and the price $50,000 are clearly stated.

Attachment - 1

The Final Report for Contract 2 between Sayana and ETRI refers to a tape out in July 2007 (GT376).

On 401 of the transcript, Allen states that obviously they were acting in good faith in paying the invoice. Allen acknowledges that the date of payment for July 2007 was clear on the invoice (see also GT880). When asked if it was his expectation for someone in accounting to review the actual text of an invoice before paying to make sure it matches the purchase order, Allen responded that he did not know how far they would have checked the work. There was not at that time any suspicion of wrongdoing.

There is evidence Laskar misled Allen (GT0909, GT0918, GT0924, GT0925, GT0928). There is also evidence that Laskar knew of the need for a quote (GT930).

**Conclusion:** The first part of the charge 1 claim, regarding the chips shipped to ETRI, is proven. The chips shipped to ETRI were purchased by Georgia Tech and there is no evidence that title to these chips was ever transferred to Sayana. There is some evidence that this may have been a common practice for start-up companies in GEDC under Laskar's leadership.

The second part of charge 1, regarding the falsified quote, is not proven. We find no direct evidence Laskar caused the quote to be fabricated.


**Charge #2:** You are charged with the violation of the policies of the board of Regents and Georgia Tech relating to professional incompetency or neglect of duty by altering GEDC membership agreements.

**GT Claim:** Laskar caused certain GEDC membership agreements to be altered in an effort to divert corporate membership fees from the GTRC to GT Foundation.

**Laskar Response:** Laskar claims that GT had grandfathered the GEDC from the rules for running a Center at GT, that GT knew that GEDC was counting on membership funds to pay down GEDC debt, and that Laskar left to the sponsor the final decision on whether funds should be a gift or a research contract.

**In Evidence:**
BAE Membership Agreement (GT0945- GT0954)
Jan-Feb 2009 there is correspondence indicating Laskar has discussions with BAE about a GEDC membership; BAE is sent agreement and payment instructions for an Education Membership for $100K. BAE signs membership agreement. Sept 2009, Laskar contacts BAE (Stroili) looking for confirmation of membership renewal in 1Q10. Laskar then corresponds with Evans, Subject: BAE Renewal, asking him to put together a list of what they got, saying to quote Frank "we can make shit up…". Evans sends a list of undisputed benefits to Laskar and asks "should we indicate that they had a student fellow?" Witness testimony from Philip Hurd relating to GT0945 stated that the Appendix to the BAE membership agreement had been modified, specifically (GT0948), the Appendix in it refers to specific instructions on where to send the money .: says send this to the Georgia Tech operating account at …. We traced that routing and account number back and that is actually the Foundation account rather than a Georgia Tech

---

Attachment - 2

operating account. When we compared it with the template from GTRC, the Appendix was very much different in GTRC's version.

**Finding:** BAE was a GEDC Education Member which allows for membership payment using unrestricted funds. Therefore the BAE membership funds should have been sent to the GT Foundation account. These types of funds are not allowed to require deliverables or IP rights (GT0057); the question is whether the fabrication of what BAE received for their membership was evidence that the unrestricted funds were misused. There is evidence that shows suspicion but not conclusive evidence that deliverables or IP were granted to BAE in exchange for their Education Membership.

There is credible evidence that Laskar attempted unsuccessfully to cause certain GEDC research opportunities to be converted from contracts to GTF gifts, specifically that he tried to divert a Qualcomm GTRC contract to a GT Foundation grant. Laskar's actions with Qualcom were unprofessional and may have damaged Georgia Tech's reputation and credibility. This indicates a pattern of behavior in which Laskar attempted to use the GT Foundation as a way to avoid GTRC indirect costs.

**Conclusion:** The charge is not proven. If GEDC membership agreements for Education Members were altered from their original form to show a GT Foundation routing and account number, this would have been appropriate given GEDC bylaws and would not have constituted professional incompetence or neglect of duty. However, the attempt to subvert the GT Foundation rules regarding deliverables was, nonetheless, a serious breach of GT policy.

**Charge #3:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to false swearing with respect to official documents filed with the Institute by failing to disclose the true nature of your ownership interest in Sayana.

**GT Claim:** Submitted COI forms for 2007-8-9 fail to disclose the full extent of Laskar's involvement in Sayana. In particular, Laskar had ownership interest in Sayana, was active in managing and directing Sayana, and his level of effort devoted to Sayana was more than the claimed one day per month.

**Laskar Response:** Laskar may have been careless in filling out his COI forms, but GT representatives (including Allen and May) knew of Laskar's status with Sayana. There is no proof that Laskar devoted more than one day per month to Sayana. May did not ask follow-up questions to Laskar regarding Sayana, and Laskar answered Garton's questions.

**In Evidence:** (GT1040-GT1082)
Laskar GIT COI form signed 07/23/07 reports yes on #1 (consulting or financial relationship with sponsor on his research) and yes on #2 (managerial or financial interest with company that does business with the Institute). The COI is signed by Gary May on 08/02/2007. His explanations include #1 technical advisor to Infinera Corp. and CTO at Quellan Corp; #2 co-founder of Quellan and serve on the BOD and advisor to Sayana Wireless an early stage WPAN Company (wireless personal area network). (GT1031-1033).

Attachment - 3

Laskar GIT COI form signed 07/3/08 reports no on #1 and yes on #2. He reports CTO at Quellan Corp and co-founder of Sayana (less than 1 day/month); goes from Advisor of Sayana to co-founder. (GT1034).

Laskar COI Form was marked "no" for #1, .. receive personal compensation from business ... related to your administrative, ... responsibilities at the Institute AND "no" for #4 .. engaged in any other activities .... that could be perceived to have potential for creating a conflict ... with the Institute responsibilities; this was not signed or dated, it appears to be an electronic form. (GT1036-1037)

Jan 2010, Garton corresponds with Laskar about his Annual COI and asks him to update to include Sayana relationship. Laskar states he is founder and Chairman of Sayana and that Sayana has no overlap of personnel but has hired GT alumni and coops (GT1038). April 2010, Laskar advises Pinel on how to respond to OSP on question regarding activities in Sayana (GT1039). Evidence shows that Sayana did have overlap of personnel.

Evidence shows Laskar actively managing Sayana from 2006 through 2010: Laskar discussing Sayana strategy with Pinel. Sept 2006, Laskar correspondence with Chang-Ho regarding W. Lee (ETRI) visit and his intent to fund GEDC $200K/year, Laskar wants to know if the funding will impact Sayana and if it will he states "I would vote for Sayana over GEDC". Sept 2006 correspondence between Pinel and Laskar about invoices and quote for ETRI. Dec 2006, March 2007, July 2007 correspondence between Pinel and Laskar about general Sayana day-to-day business details. July 2007 copy of sample employment offer letter on Sayana letterhead. July 2009 Sayana receives $280K for CRA with FCI and invoice signed by Laskar, President and Manager (P&M). Feb 2010, Sayana $70K invoice to FCI signed by Laskar, P&M. A fax, dated Jan 20, 2010, of a Development Agreement between Sayana and Microsoft signed by Laskar, P&M. Invoice to Microsoft for $250K signed by Laskar P&M. Invoice to Samsung dated April 19, 2010, for $156.2K signed by Laskar, P&M.

Finding: The evidence shows:
1) Laskar made false statements on his COI form signed 07/23/07 when he stated he was an advisor to Sayana and on his July 2008 COI when he stated he was co-founder of Sayana with less than 1 day/month involvement. His email correspondence indicated he was making management decisions from as early as Sept 2006 and that he was involved more than 1 day/month.
2) On his COI form (GT072-073) he indicated he did not engage in any activities that could be perceived to have potential for creating a conflict with his Institute responsibilities, and this was shown to be false and that he indeed did engage in activities that were a conflict of interest.
3) In his correspondence with Garton in Jan 2010, he states he has no overlap of personnel but Pinel is clearly working for Sayana and GT.
4) He conducted Sayana business routinely using his GT email, evidently his GT computer, and during normal business hours, and did not compensate Georgia Tech for the use of their facilities.
5) Defensive cross of Garton, May, & Allen showed they all knew of Laskar's involvement with Sayana.

Conclusion: This charge is proven, the submitted COI forms did not fully disclose the extent of Laskar's participation in Sayana, nor the clear conflicts that were created in the case of ETRI. However, testimony

of May and Allen indicates that each of them knew of Laskar's involvement with Sayana, and neither pursued any concern about potential conflicts.

**Charge #4:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech students and other resources from certain research contracts.

**GT Claim:** Individuals under Laskar's supervision who were paid full time by Georgia Tech were diverted from Georgia Tech projects to a full time assignment to Sayana work required to satisfy a contract from ETRI.

**Laskar Response:** In the written response to this charge, Laskar stated that individuals who worked on Sayana's ETRI contract were doing so within the Georgia Tech guidelines for outside work (cited as 1 day per month, but actually 1 day per week for faculty, and 20 hours per month for a co-op). In addition, in the course of the witness testimony, Laskar's attorney stated on several occasions (though without evidence) that all the information contained in the reports to ETRI had been previously published and was therefore "in the public domain and available for anyone to use."

**In Evidence:**
Sayana submitted a proposal to ETRI describing work to be done in two phases: phase 1, August-December, 2006, involved "evaluation and characterization of 90 nm CMOS for 60 GHz applications" (at GT0174), and phase 2, January-December, 2007 for the "development of a 60GHz integrated transceiver" (at GT0174). The statement of work calls for the following:
"A first tape-out will be dedicated to ..." (at GT0174)
"A complete 60 GHz integrated module prototype will be developed..." (at GT0175)
Phase 1 requirement is "Access to 90 nm CMOS process...for a value of $150,000" (at GT 0176)
Phase 2 requirement is "Access to 90 nm CMOS process for a total value of $180,000" (at GT0177)
The proposal contains budget details for 2006 (at GT0178) showing that Sayana will contribute $100,000 toward "Direct labor/Design" and ETRI will contribute $100,000, for a total of $200,000. This budget breakdown is accompanied by a note stating "The total expenses related to "Direct labor/Design services," which would be $200,000, corresponds to the support of five engineers during the August-December 2006 period."

Subsequently, Sayana entered into a contract with ETRI ("collaborative research agreement" at GT0180) on 25Sep06. This contract has exactly the same phase 1 timeline and budget as the proposal (compare GT0178 and GT0187), with the exception of the note; the expenses related to "Direct labor/Design services," still at $200,000, is to fund four engineers, not five. The contract also identifies the Sayana staff, showing Pinel, Sarkar, Padmanava, and Mukhopadhyay as the only individuals with a 100% load in phase 1. Evidence shows that Pinel (at GT1099), Sarkar (at GT1105), Padmanava (at GT1106), and Mukhopadhyay (at GT1098) all were employees of Georgia Tech, paid 100% from Georgia Tech funds during the period August-December, 2006.

The interim report for this contract (at GT0200) shows the same four engineers with a 100% load.

Attachment - 5

Neither the interim report (at GT0198) nor the final report for phase 1 (at GT0235) cite any thesis or dissertation, any publication or paper submitted for publication, or any public presentation as the source of the data contained in the report.

**Analysis:** Both the proposal and the contract clearly state that the $200,000 for "Direct labor/Design services" is to support the engineers performing these services. It would be very difficult to construe these notes as addressing anything other than direct salary expense. If the four engineers assigned to the ETRI contract worked a full five months (August to December), and their labor cost (as stated in the proposal, and subsequently funded in the contract) was $200,000 then their equivalent full time monthly salary would be $200,000/(4x5) = $10,000, which might be high, but not unreasonable for a design engineer on the leading edge of a potentially very valuable technology. On the four other hand, if these four individuals all were allowed to work a maximum of one day per week (the contemporary Georgia Tech guideline for faculty work outside Georgia Tech), their equivalent full time salary would be five times higher, i.e., $50,000 per month. This does not seem reasonable for a direct salary expense, or even for a fully burdened salary rate.

**Finding:** The most straightforward interpretation of the evidence is that Georgia Tech employees were not diverted from their Georgia Tech work, but the results of their Georgia Tech work was appropriated by Sayana to satisfy a contract with ETRI. The ETRI contract appears to reimburse Sayana for this Georgia Tech work, but Sayana did not then reimburse Georgia Tech. Laskar's attorney claimed the information in the ETRI reports was in the public domain, but the ETRI reports failed to cite any original sources.

**Conclusion:** This charge is not proven, i.e., while it is possible that Institute resources were diverted, it is not proven. However, it is clear that Sayana received payment for work that actually was performed (and paid for) by Georgia Tech, and that Sayana failed to properly cite the original sources for the data contained in the reports to ETRI.

**Charge #5:** You are charged with the violation of the policies of the Board of Regents and Georgia Tech relating to the disruption of teaching and Institute research by diverting Georgia Tech resources to benefit Sayana.

**GT Claim:** Sayana was using GT offices, lab space, equipment, and IT resources for its own research and its own business without the GT authorization that would have been associated with a cost center or lease/rental agreement with the Institute.

**Laskar's Response:** Sayana was treated no different than any other GEDC start-up company. GEDC bylaws expressly provided access to Members, which in practice meant office space, access and use of lab equipment and design tools. Georgia Tech never required cost centers or lease/rental agreements with any GEDC Member or start-up. From mid-2008 onward, GEDC operations were reviewed regularly by

Attachment - 6

both May and Allen. There was so much confusion about the rules applicable to GEDC that an email was sent to all affiliated faculty regarding what was permissible for faculty start-ups.

**In Evidence:**
Sayana employees used GT space, computers, software, and other resources (GT1113-1154). The documented use of the Cadence tool was in violation of the license agreement (GT1109-1112).
In a sworn statement, Paul Hesler states that his Georgia Tech startup company "GTronix was eligible for automatic membership in GEDC" and that "GTronix was not required to pay memberhip dues for its GEDC membership because it was a startup company through Georgia Tech." However, in the GEDC bylaws, there is no mention of spin-out companies being 'automatic' members.

In a letter dated Dec. 16, 2008, Pinel announces Sayana's intent to apply for a full GEDC membership (GT1017). The corresponding gift to the GTF was provided in February 2009 (GT1019-1020), suggesting an educational membership according to the GEDC bylaws (GT0057). The GEDC bylaws further state that ``All Members shall receive…Access to GEDC resources, personnel, and activities specified by GEDC from time to time" (GT0058). However, the precise definition of "Access" is not provided. May's testimony indicates that other GEDC members used equipment, software, and facilities (transcript 469-472).

**Analysis:** There is nothing in the bylaws about spin-out membership and no evidence of Sayana's GEDC membership until February 2009. Furthermore, Sayana's documented use of Georgia Tech resources does not seem consistent with the statement about "Access…from time to time" in the GEDC bylaws. However, oversight and reviews of GEDC operations with the Senior Vice Provost for Research did not appear to raise red flags with respect to the presence of and treatment of spin-outs and members.

**Conclusion:** The charge as written is proven. There is evidence that other startup companies and members used Georgia Tech resources as well under Laskar's leadership, without raising flags.

Attachment - 7